UNITED STATES of America,
Plaintiff-Appellee,

v.

Mitchell MILLER, Susan McDuffie
Weeks, and John Henry McDuffie,
Defendants-Appellants.

No. 73–2405.

United States Court of Appeals,
Fifth Circuit.

Sept. 13, 1974.

Rehearing Denied Oct. 11, 1974.

D. L. Rampey, Jr., Warner Robins, Ga., for Miller.

W. W. Larsen, Jr., Dublin, Ga., for Weeks and McDuffie.

William J. Schloth, U. S. Atty., Ronald T. Knight, O. Hale Almand, Asst. U. S. Attys., Macon, Ga., for plaintiff-appellee.

Before GEWIN, GOLDBERG and CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

On January 9, 1973, a fire broke out at the Southeastern Metal Company warehouse in Kathleen, Georgia. When officials of the Houston County Sheriff's Department and volunteer fire department arrived to fight the blaze, they discovered in the building a 7500 gallon-capacity distillery, some 175 gallons of non-tax-paid whiskey, and related paraphernalia. With this discovery the lush dreams of bourbon living that the still owners must have harbored were suddenly scotched.

Although no arrests were made at that time, five persons—Mitchell Miller, John Henry McDuffie, Susan McDuffie Weeks, Joseph Kenneth Brooks, and Terry Lee Smith—were subsequently charged with conspiracy to defraud the United States of tax revenues by the manufacture and possession of distilled spirits. In addition, all of the alleged co-conspirators except Weeks were charged with substantive counts of possession of an unregistered still, carrying on the business of distillers without giving bond and with intent to defraud the United States of the whiskey tax, and possession of 175 gallons of non-tax-paid whiskey. Prior to trial the charges against Smith were dismissed, and the court granted Brooks' motion for severance.[1]

The trial of defendants Miller, McDuffie, and Weeks began on April 23, 1973, and ended in a mistrial on May 1, 1973. A second trial commenced on May 7, 1973, resulting in conviction of all three defendants on all charges. Miller and McDuffie were sentenced to three years imprisonment; Weeks received five years probation.

On this appeal defendants urge ten separate grounds for reversing their convictions. Only one issue is common to all three defendants, and one argument is made by both McDuffie and Weeks; in addition, Miller argues five alleged trial court errors; McDuffie, two; and Weeks, one.

## I. ISSUES RAISED BY MORE THAN ONE DEFENDANT

A. *The Business Records Act.* The one contention shared by all three defendants is that the district court erred by admitting into evidence copies of customers' phone bills without proper foundation under the Business Records Act, 28 U.S.C. § 1732,[2] and without the nec-

---

1. Brooks subsequently entered a plea of guilty to one count of the indictment and was sentenced to 5 years probation with supervision. The remaining counts against Brooks were dismissed.

2. § *1732. Record made in regular course of business; photographic copies*
   (a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

   All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

essary showing of trustworthiness. The thrust of defendants' objection is that the items should not have been admitted because: 1) they were not prepared under the supervision of the witnesses who testified as to their authenticity; and 2) they were copies of bills made up monthly from records and not contemporaneously with the transaction, and thus did not constitute the best evidence of the matters reflected thereon.

In view of the purpose and plain meaning of section 1732, we find defendants' arguments unpersuasive. The statute explicitly establishes the admissibility of "any writing or record . . . if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record . . . ." In Sabatino v. Curtiss National Bank of Miami Springs, 5 Cir. 1969, 415 F.2d 632, this Court reviewed cases in which items offered under the Business Records Act had been excluded. We concluded that the statute's primary purpose was "to provide a check on trustworthiness," and that records should be admitted if three conditions are met:

(1) the records must be kept pursuant to some routine *procedure* designed to assure their accuracy, (2) they must be created for *motives* that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and (3) they must

not themselves be mere cumulations of hearsay or uninformed opinion.

415 F.2d at 637. The type of telephone toll records introduced in the trial below clearly meet section 1732 standards. *See* United States v. Mirenda, 9 Cir. 1971, 443 F.2d 1351, 1357; *cf.* United States v. Covello, 2 Cir. 1969, 410 F.2d 536, 542, cert. denied, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136.

We have often noted that the trial court has a broad zone of discretion in determining the admissibility of documents such as business records, and that the court's rulings should be disturbed only when that discretion has been abused. *E. g.*, United States v. Middlebrooks, 5 Cir. 1970, 431 F.2d 299, 302, cert. denied, 1971, 400 U.S. 1009, 91 S. Ct. 569, 27 L.Ed.2d 622. Defendants contend that the telephone records were rendered inadmissible because the witnesses whose testimony laid the foundation for receipt of these items were not the persons who kept the records. This contention is not supported by the statute and is directly contradicted by the weight of judicial authority. "[T]he person who actually keeps the books and records and makes the entries need not testify if a person does testify who is in a position to attest to the authenticity of the records." United States v. Dawson, 2 Cir. 1968, 400 F.2d 194, 199. Indeed, section 1732 was adopted in part to eliminate the requirement that the entrant appear to authenticate the record.

The term "business," as used in this section, includes business, profession, occupation, and calling of every kind.

(b) If any business, institution, member of a profession or calling, or any department or agency of government, in the regular course of business or activity has kept or recorded any memorandum, writing, entry, print, representation or combination thereof, of any act, transaction, occurrence, or event, and in the regular course of business has caused any or all of the same to be recorded, copied, or reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic, or other process which accurately reproduces or forms a durable medium for so reproducing the original, the original

may be destroyed in the regular course of business unless its preservation is required by law. Such reproduction, when satisfactorily identified, is as admissible in evidence as the original itself in any judicial or administrative proceeding whether the original is in existence or not and an enlargement or facsimile of such reproduction is likewise admissible in evidence if the original reproduction is in existence and available for inspection under direction of court. The introduction of a reproduced record, enlargement, or facsimile does not preclude admission of the original. This subsection shall not be construed to exclude from evidence any document or copy thereof which is otherwise admissible under the rules of evidence.

United States v. Anderson, 8 Cir. 1971, 447 F.2d 833, 839; United States v. Re, 2 Cir. 1964, 336 F.2d 306, 314, cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L. Ed.2d 177. Three telephone company employees testified that the government exhibits in question were copies of customer bills and company records, were kept in the ordinary course of business, ·and were made at or near the time of the transactions reflected on them. That testimony was clearly sufficient to justify admitting the records.

■ Defendants' argument that these records were not the best evidence is similarly without merit. The best evidence rule has repeatedly been held inapplicable to records admitted under the Business Records Act. United States v. Anderson, *supra;* United States v. Vandersee, 3 Cir. 1960, 279 F.2d 176, 180; United States v. Kimmel, 2 Cir. 1960, 274 F.2d 54, 57.

■ The telephone records in question were clearly admissible under the three prongs of the *Sabatino* test. First, in each instance they were records kept in the regular course of business on a routine basis designed to assure their accuracy. Second, the purpose for keeping the records was not to prepare for litigation but to assure accurate billing of customers. Third, they were not mere cumulations of hearsay or informal opinion, but they were made at or near the time of the transactions reflected in them. We therefore hold that the district court did not abuse its discretion in admitting the telephone toll records into evidence.

B. *Discovery.* Weeks and McDuffie also claim that the trial court improperly denied their motions under Rule 16(a), Federal Rules of Criminal Procedure, to discover the results of fingerprint and handwriting analyses conducted by government experts. Defendants argue that Rule 16(a) should be broadly construed and that the district court should be given only limited discretion to deny a proper motion for discovery. Professor Wright has found support for this view by comparing Rule 16(a) with Rule 16(b):

> Since a specified showing [of materiality] is required under (b), but not under (a), the plain inference is that no showing is required for discovery under (a), and that while that subdivision is cast in discretionary terms it gives the defendant "virtually an absolute right" to discovery of the materials there listed. The nature of the materials covered by subdivision (a), and the strong interest of the defendant in having access to them, justifies such discovery as a matter of right.

1 C. Wright, Federal Practice and Procedure, Criminal § 253, pp. 500–01.

■ Although this Court has approved a standard similar to that suggested by Professor Wright, *see* United States v. White, 5 Cir. 1971, 450 F.2d 264, 267–268, we have also adhered to the rule that "an error in administering the discovery rules is not reversible absent a showing that the error was prejudicial to the substantial rights of the defendant." United States v. Saitta, 5 Cir. 1971, 443 F.2d 830, 831; Fed.R. Crim.P., Rule 52(a). We are satisfied that, on the peculiar facts of the present case, no prejudice to defendants could have resulted from the denial of their motion for discovery.

In the first place, as partial grounds for denial of the motion, the trial judge acknowledged that in open court the government had offered defendants access to the handwriting and fingerprint evidence. The record gives no indication that the government withdrew its offer or declined to make the information available. Moreover, all of the evidence in question was introduced at the first trial; defendants have brought this appeal from the second trial. Thus, the first trial itself provided disclosure not only of the contents of the reports, but also of the substance of the experts' testimony. As a result of this combination of circumstances, any error in denying motions for discovery was rendered harmless by the time of the second trial.

## II. MITCHELL MILLER

In addition to his Business Records Act claim, defendant Miller makes five assignments of error on this appeal: (1) the trial court erred by admitting microfilm copies of Miller's bank checks obtained by means of an illegal grand jury subpoena duces tecum; (2) the trial court erred by overruling, on the ground of lack of standing, Miller's motion to suppress evidence from a Pepsico rental truck; (3) the trial court abused its discretion by denying Miller's motion for continuance; (4) the trial court abused its discretion by denying Miller's motion for severance; (5) the trial court erred in denying Miller's motion for directed verdict of acquittal as to Counts 2, 3 and 5.

A. *The "Grand Jury" Subpoena.* Miller's objection to the introduction of microfilm copies of his bank checks rests on two separate but related contentions. First, relying primarily on the three-judge district court decision in Stark v. Connally, N.D.Cal.1972, 347 F. Supp. 1242, Miller asserts that provisions of the Bank Secrecy Act of 1970 requiring banks to microfilm all checks passing through them constitute a violation of depositors' Fourth Amendment rights to be free from unreasonable searches and seizures. Second, Miller claims that the subpoenas used to obtain the microfilm copies here were illegal because they were issued by the United States Attorney rather than by the court, because no return was made upon the subpoenas to the court, and because the subpoenas were issued for a date when the grand jury was not in session.

■ Miller's argument that the Bank Secrecy Act is unconstitutional is now foreclosed by the Supreme Court's recent decision in California Bankers Ass'n v. Shultz, 1974, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812, reversing in part Stark v. Connally, *supra.* However, in view of the long recognized inclusion of private papers and records within the scope of Fourth Amendment protections, reinforced by the Court's reasoning in *California Bankers,* we hold that obtaining copies of Miller's bank checks by means of a faulty subpoena duces tecum constituted an unlawful invasion of Miller's privacy, and that any evidence so obtained should have been suppressed.

On January 23, 1973, agents of the government's Alcohol, Tobacco & Firearms (ATF) Unit presented to Barry Jones, President of Citizens and Southern National Bank, Warner Robins, Georgia, and to Harold Peavey, President of the Bank of Byron, Byron, Georgia, purported grand jury subpoenas duces tecum requiring them to appear in the United States District Court for the Middle District of Georgia at 9:00 a. m., on January 24, 1973. The subpoenas commanded the recipients to produce

> all records of accounts, *i. e.*, savings, checking, loan or otherwise, in the name of Mr. Mitch Miller, 3859 Mathis Street, Macon, Ga. and/or Mitch Miller, Associates, 100 Executive Terrace, Warner Robins, Ga., from October 1, 1972, through the present date.

Defendant Miller was not advised that these subpoenas had been served. After the banks supplied the requested documents to the ATF agents, Jones and Peavey were advised that they would not need to appear at the January 24 grand jury session. In fact, the grand jury did not meet on January 24; their next meeting was on February 12, nearly three weeks later.

At the suppression hearing ATF Agent Powell testified that he viewed microfilm copies of all checks on Miller's account at the Bank of Byron and took copies of one deposit slip and one or two checks. At the Citizens and Southern Bank Agent Powell received copies of all of Miller's checks for the period covered by the subpoena except for two that would not print. The prosecution introduced several of these copies into evidence at trial, using them to help establish at least three of the overt acts charged against Miller in furtherance of the conspiracy.

Both Jones and Peavey entered stipulated testimony that their banks kept microfilm copies of customers' accounts and of personal checks paid through those accounts "in compliance with Treasury and Banking Regulations issued under the Bank Secrecy Act."[3] The Citizens and Southern Bank had not maintained complete microfilm check records prior to the effective date of the regulations (Record, Vol. II, pp. 35–36); the trial transcript does not reflect whether the Bank of Byron had previously kept such records.

As we have noted, the Supreme Court's decision in California Bankers Ass'n v. Shultz, *supra,* disposes of Miller's challenge to the constitutionality of the recordkeeping requirements of the Bank Secrecy Act. That decision, however, did not place the judicial stamp of approval upon every prosecutorial tactic for obtaining records compiled under the requirements of the Act.

■ The Supreme Court determined almost 90 years ago that "a compulsory production of a man's private papers to establish a criminal charge against him . . . is within the scope of the Fourth Amendment . . .." Boyd v. United States, 1886, 116 U.S. 616, 622, 6 S.Ct. 524, 528, 29 L.Ed. 746. The venerable *Boyd* doctrine still retains its vitality;[4] the government may not cavalierly circumvent *Boyd's* precious protection by first requiring a third party bank to copy all of its depositors' personal checks and then, with an improper invocation of legal process, calling upon the bank to allow inspection and reproduction of those copies. In upholding the Bank Secrecy Act the divided *California Bankers* Court determined that the government could take the first of those steps without exceeding constitutional limits. The Court, however, did not choose to abandon 90 years of precedent by proclaiming open season on personal bank records. Indeed, in rejecting the Fourth Amendment claims of bank depositor plaintiffs, the *California Bankers* majority, in an opinion by Justice Rehnquist, relied heavily upon the proposition that depositors have adequate legal protection from improper government access to their records:

We see nothing in the Act which violates the Fourth Amendment rights of any of these plaintiffs. Neither the provisions of Title I [Recordkeeping Requirements] nor the implementing regulations require that any information contained in the records be disclosed to the Government; both the legislative history and the regulations make specific reference to the fact that access to the records is to be controlled by existing legal process.

416 U.S. at 52, 94 S.Ct. at 1513, 39 L. Ed.2d at 835.[5] Surely a purported

---

3. Record, Vol. I, pp. 73, 76. The pertinent section of the Bank Secrecy Act, 12 U.S.C. § 1829b(d), provides:
    (d) Each insured bank shall make, to the extent that the regulations of the Secretary so require—
    (1) a microfilm or other reproduction of each check, draft, or similar instrument drawn on it and and presented to it for payment; and
    (2) a record of each check, draft, or similar instrument received by it for deposit or collection, together with an identification of the party for whose account it is to be deposited or collected, unless the bank has already made a record of the party's identity pursuant to subsection (c) of this section.
The regulations promulgated pursuant to section 1829b(d) essentially require that

each bank retain either the original or a copy of each check, draft, or money order in excess of $100 drawn on the bank or issued and payable by it. 31 C.F.R. § 103.34(b)(3) (1973). Such records must be retained for a period of five years. 31 C.F.R. § 103.-36(c)(1973).

4. *Boyd* was recently cited as the "fountainhead case" in the establishment of privacy as a fundamental value protected by the Bill of Rights. Roe v. Wade, 1973, 410 U.S. 113, 209 n. 2, 93 S.Ct. 705, 35 L.Ed.2d 147 (Douglas, J. concurring).

5. *See* 31 C.F.R. § 103.51 (1973). The Report of the House Committee on Banking and Currency states:
    It should be borne in mind that records to be maintained pursuant to the regula-

grand jury subpoena, issued not by the court or by the grand jury, but by the United States Attorney's office, for a date when no grand jury was in session, and which in effect compelled broad disclosure of Miller's financial records to the government, does not constitute sufficient "legal process" within the meaning of the majority opinion.[6]

It is no answer to argue, as does the government on this appeal, that bank officials cooperated fully and without objection; for he whose rights are threatened by the improper disclosure here was a bank depositor, not a bank official, and depositors as well as banks must be accorded the protection of "legal process." *See* Donaldson v. United States, 1971, 400 U.S. 517, 537, 91 S.Ct. 534, 27 L.Ed.2d 580 (Douglas, J., concurring); United States v. Kordel, 1970, 397 U.S. 1, 7, 90 S.Ct. 763, 25 L.Ed.2d 1. The trial court should not have admitted into evidence copies of Miller's bank checks or any evidence resulting from investigative leads provided by information from those checks. Without attempting to chart any future course to be followed to validly obtain such evidence, we now hold that defendant Miller is entitled to a new trial free from the taint of evidence improperly acquired.

B. *Standing to Challenge the Search of the Pepsico Van.* Defendant Miller raises one other very troublesome issue on this appeal. He argues that the trial court improperly overruled, on the basis of lack of standing, his motion to suppress distillery apparatus and raw material seized from a Pepsico rental truck. On the basis of information supplied by an informant that a "blue van type truck . . . would be picking up some kind of illegal stuff to manufacture liquor," Deputy Sheriff Burnham stopped a Pepsico truck, which was occupied by Joseph Brooks and Terry Lee Smith.[7] When Brooks and Smith were unable to produce a key to the back of the van, Deputy Burnham took them and the truck to the county jail, obtained a search warrant, and searched the truck; the search revealed cylinders of bottled gas, a shotgun condenser, two 100 pound bags of wheat shorts, a cap, and 150 five gallon plastic jugs. Defendants Miller, Weeks, and McDuffie all filed motions to suppress the evidence obtained from the Pepsico truck.[8] On April 19, 1973,

---

tions of the Secretary of the Treasury will not be made automatically available for law enforcement purposes. They can only be obtained through existing legal process.

H.Rep.No.91–975, 91st Cong. 2d Sess. 5 (1970); 2 U.S.Code Cong. & Admin.News 4395 (1970). *See also* S.Rep.No.91–1139, 91st Cong., 2d Sess., 10 (1970).

6. A separate opinion filed by two members of the six Justice majority in the *California Bankers* case provides additional support for this proposition. Justice Powell, for himself and Justice Blackmun, joined the majority opinion, but entered a separate concurring opinion to note his concern over the scope of the reporting provisions of the Act, which confer broad authority on the Secretary of the Treasury to require financial institutions to file reports of domestic monetary transactions. Limiting his approval of these requirements to the boundaries of the current implementing regulations—transactions in currency of more than $10,000, 31 C.F.R. § 103.22 (1973)—Justice Powell warned that significant extension of the government's power to compel disclosure of financial

transactions would pose substantial constitutional difficulties:

Financial transactions can reveal much about a person's activities, associations, and beliefs. At some point, governmental intrusion upon these areas would implicate legitimate expectations of privacy. Moreover, the potential for abuse is particularly acute where, as here, the legislative scheme permits access to this information without invocation of the judicial process. In such instances, the important responsibility for balancing societal and individual interests is left to unreviewed executive discretion, rather than the scrutiny of a neutral magistrate.

416 U.S. at 78, 94 S.Ct. at 1526, 39 L.Ed.2d at 850–851 (Powell, J. concurring). A governmental order to disclose copies of a bank depositor's checks is at least as obnoxious to constitutional principles when exercised, as here, without sanction in statute or regulation as it would be under authority of an extended legislative scheme.

7. *See* footnote 1 *supra* & accompanying text.

8. The record is unclear as to whether Brooks and Smith filed motions to suppress.

the district court granted those motions, declaring that:

the affidavit in question and the resulting search warrant does [sic] not meet the minimum requirements of the laws of the State of Georgia, Georgia Law 1966, pp. 567–568, as informally codified in Ga.Code Ann. 27–303, and the constitutional requirements as interpreted by the Supreme Court of the United States in the cases of Aguilar v. Texas, 378 U.S. 108, 12 L.Ed.2d 723, 84 S.Ct. 1509; Spinelli v. United States, 393 U.S. 410, 21 L.Ed.2d 637, 89 S.Ct. 584, and United States v. Harris, 403 U.S. 573, 29 L. Ed.2d 723, 91 S.Ct. 2075, in that said affidavit, among other things, does not contain information in any way sufficient to demonstrate that the Justice of the Peace who issued the search warrant in question was afforded information by which the Justice of the Peace had the opportunity to independently judge the sufficiency of the information furnished by the informer to the Deputy Sheriff. (Record, Vol. I., pp. 78–79).

On the morning the first trial began, the government moved the court to reconsider its order granting defendants' motions to suppress, claiming that defendants Miller, McDuffie, and Weeks lacked "the requisite standing to challenge the illegal search" because they "were neither in the vehicle nor owners of, nor claimants of an interest in the vehicle or the object seized therefrom," (Record, Vol. I, pp. 91, 93–94). The court granted the government's motion and permitted the evidence to be introduced at trial.

In his motion to suppress, defendant Miller stated that he "believes that the Government will attempt to prove either the purchase of or ownership by him of the above described vehicle." (Record, Vol. I, p. 34). The conspiracy count of the original indictment, in Overt Act # 9, charged that Miller had purchased the Pepsico van in question on November 22, 1972, from Dixie Truck and Parts Company and that Miller had indicated that the purchase was for Trans Aero Corporation. In order to defeat Miller's standing to challenge the search of the van, the government agreed to have Overt Act # 9 deleted from the indictment. At the hearing on the government's motion to reconsider the suppression order, the prosecution took the position that the corporation, not Miller, owned the truck. By arrangement of its evidence at the second trial, however, the government sought to show that Miller exercised control over the use of the van and that the purchase in the name of the corporation was merely a straw purchase by Miller. Other than his allegation that "the Government will attempt to prove . . . ownership," Miller made no claim, either before or during the trial, that he owned the van.

The facts of this case pose the question left unanswered by Brown v. United States, 1973, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208, the Supreme Court's most recent ruling on the requirements for standing to challenge a search, and by *Brown*'s gloss on the Court's earlier decision in Jones v. United States, 1960, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697. In *Brown* the Court held that, at least when prosecutorial self-contradiction is not a factor,

there is no standing to contest a search and seizure where . . . the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure.

411 U.S. at 229, 93 S.Ct. at 1569. Miller alleged, not that he had a proprietary or possessory interest in the premises, but that the government would attempt to prove such an interest; and Miller cannot claim standing on the basis of either standard (a) or standard (c). Therefore, absent the element of prosecutorial self-contradiction in the present case,

Miller would not be able to challenge the search and seizure of the van.

The Court's earlier *Jones* decision, however, clearly deemed that missing element to be a critical factor:

[T]o hold that petitioner's failure to acknowledge interest in the narcotics or the premises prevented his attack upon the search, would be to permit the Government to have the advantage of contradictory positions as a basis for conviction. . . . The prosecution here thus subjected the defendant to the penalties meted out to one in lawless possession while refusing him the remedies designed for one in that situation. It is not consonant with the amenities, to put it mildly, of the administration of criminal justice to sanction such squarely contradictory assertions of power by the Government.

362 U.S. at 263–264, 80 S.Ct. at 732.[9]

The self-contradictory prosecutorial conduct in the present case is within the ambit of the reasoning, if not the strict holding, in *Jones*. The Court in *Brown*, however, viewing *Jones* through the prism of the intervening case of Simmons v. United States,[10] left open the question of whether standing is conferred as a matter of course, even absent any of the three stated indicia, when prosecutorial self-contradiction is demonstrated:

[W]e do not decide that this vice of prosecutorial self-contradiction war-

rants the continued survival of '*Jones*' "automatic" standing now that our decision in *Simmons* has removed the danger of coerced self-incrimination. We simply see no reason to afford such "automatic" standing where, as here, [there was no] risk to a defendant of either self-incrimination or prosecutorial self-contradiction.

Brown v. United States, *supra*, 411 U.S. at 229, 93 S.Ct. at 1569.

Given the posture of the case *sub judice*, we also may defer a decision as to whether the government's duplicitous tactics were sufficient to confer standing upon defendant Miller. Miller is entitled to a new trial because of the trial court's error in admitting copies of his bank checks into evidence. *See* Part II A, *supra*. At his new trial Miller may choose to assert his proprietary interest at the suppression hearing. He would thereby establish, under standard (b) of the *Brown* test, his standing to challenge the search of the van, and would obviate any need for this Court to decide what follows *Jones* and *Brown* in this troublesome area of criminal procedure.

C. Continuance, Severance, and Insufficient Evidence. After careful consideration of the record on appeal and the arguments of the parties, we find no merit in Miller's remaining assignments of error. The trial court did not abuse its discretion by denying Miller's motions for continuance[11] and for

---

9. Although in the case *sub judice* ownership of the truck was not an essential element of the offense charged and Miller's proprietary or possessory interest would not have been lawless *per se*, the government obviously considered Miller's ownership and control over the van to be quite important in establishing his connection with the conspiracy. The distinction clearly does not render the government's trial and pre-trial positions any less contradictory.

10. 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L. Ed.2d 1247. In *Simmons* the Court held that, when a defendant makes statements in a pretrial hearing to establish standing to challenge a search, that testimony may not

be used against the defendant at trial. According to the *Brown* Court, *Simmons* removed the most dangerous aspects of the self-incrimination element from the *Jones* equation.

11. Miller's motion for continuance prior to the second trial was based on his assertion that pretrial publicity and erroneous news reports about testimony and evidence at the first trial would have prevented him from receiving a fair trial before an impartial jury at that time. The second trial was scheduled to begin only six days after the first had ended in a mistrial. Our independent review of the record has revealed neither inherently prejudicial publicity, Shep-

severance. *See, e. g.,* Ungar v. Sarafite, 1964, 376 U.S. 575, 84 S.Ct. 841, 11 L. Ed.2d 921 (continuance); McKinney v. Wainwright, 5 Cir. 1974, 488 F.2d 28, cert. denied, 416 U.S. 973, 94 S.Ct. 1998, 40 L.Ed.2d 562 (continuance); Leach v. United States, 5 Cir. 1968, 402 F.2d 268, cert. denied, 1969, 393 U.S. 1082, 89 S. Ct. 864, 21 L.Ed.2d 775 (severance). Finally, we conclude that there was sufficient evidence for the district judge to submit to the jury the questions of defendant Miller's guilt or innocence of possessing an unregistered distillery (Count 2), carrying on the business of a distiller without giving bond (Count 3), and possessing non-tax-paid whiskey (Count 5).

### III.   JOHN HENRY McDUFFIE

■■ ■■   In addition to his Business Records Act claim [12] and his discovery claim,[13] defendant John Henry McDuffie makes two assignments of error on this appeal: 1) that the trial court erred by refusing to allow McDuffie to introduce evidence as to the existence of an illicit distillery not connected with other evidence in the case; and 2) that the trial court erred by admitting evidence of McDuffie's prior indictment and guilty plea for possession of non-tax-paid whiskey. We find no merit in the first claim. We conclude, however, that defendant McDuffie must be granted a new trial because the introduction of evidence of his prior offense violated the "universal rule . . . that evidence of the commission of a wholly separate and independent crime is not admissible

as a part of the case against the defendant." 2 C. Wright, Federal Practice and Procedure, Criminal § 410, at 123.

This Court has, of course, recognized a number of exceptions to the "universal rule." In the present case the government urges that McDuffie's prior conviction for possession of non-tax-paid whiskey was properly admitted under the "intent" exception. The Fifth Circuit has indeed held that, in certain cases,

> evidence of other offenses by the accused is admissible to show his criminal intent as to the offense charged, where the other offenses are similar to and not too remote from that charged, and where intent is in issue as an element of the offense charged.

Weiss v. United States, 5 Cir. 1941, 122 F.2d 675, 682, cert. denied, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550. The government's rationale, and the one apparently adopted by the court below, is that because evidence of other crimes may be introduced to show intent, because intent is an element in at least two counts of the indictment against McDuffie, and because both the prior crime and the presently alleged offenses involve moonshine whiskey, the earlier conviction must be admissible. (*See* Record, Vol. III, pp. 286–298—in chambers discussion among court and counsel on government's offer of prior crime evidence).

That analysis, however, fails to take into account the constancy with which this Court has adhered to the view that the "universal rule" against admitting

---

pard v. Maxwell, 1966, 384 U.S. 333, 86 S. Ct. 1507, 16 L.Ed.2d 600, nor actual prejudice on the jury panel. Hale v. United States, 5 Cir. 1970, 435 F.2d 737.

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that

the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Irvin v. Dowd, 1961, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751; Hale v. United States, *supra*, 435 F.2d at 745–746.

12.   *See* Part I A, *supra*.

13.   *See* Part I B, *supra*.

evidence of other crimes is a just and wise rule, and that the exceptions to that principle, each of which has been carved out to serve a limited prosecutorial and judicial purpose, should not be permitted to swallow the rule.[14] Pursuant to that view we have adopted a balancing approach, most recently articulated in United States v. Goodwin, 5 Cir. 1974, 492 F.2d 1141, 1150:

> Assuming, of course, that the evidence of other crimes is clear and convincing, we must balance the actual need for that evidence in view of the contested issues and the other evidence available to the prosecution, and the strength of the evidence in proving the issue, against the danger that the jury will be inflamed by the evidence to decide that because the accused was the perpetrator of the other crimes, he probably committed the crime for which he is on trial as well.

See also, United States v. Lawrance, 5 Cir. 1973, 480 F.2d 688, 691–692 n. 6; United States v. Johnson, 5 Cir. 1972, 453 F.2d 1195, 1199; United States v. Boyd, 5 Cir. 1971, 446 F.2d 1267, 1270–1271. The trial record reveals that virtually no consideration was given to any of the crucial elements in the balancing process—the government's actual need for the evidence, the probative value of the evidence, or the potential prejudice to the accused.

Our own examination of the relevant factors indicates that the evidence in question ought to have been excluded. The government argues that intent to defraud the United States of the tax on distilled spirits is the element of Count 1 (conspiracy) and Count 4 (carrying on the business of distiller of spiritous liquors) that justifies admitting McDuffie's prior conviction. We cannot agree. As to establishing that type of intent, we see no probative value whatsoever in defendant's earlier conviction of possession of non-tax-paid whiskey, a crime which requires no such intent. See Hamilton v. United States, 5 Cir. 1969, 409 F.2d 928, 930; McClain v. United States, 5 Cir. 1955, 224 F.2d 522, 525. The government urges vigorously that possession is one of the items in the count of conspiracy to defraud "by manufacturing, distilling, possessing, transporting, removing, depositing and concealing distilled spirits . . ."; but the trial record clearly demonstrates that the government's proof against McDuffie went primarily to conspiracy to manufacture and distill rather than conspiracy to possess. In any event, the conduct involved in simple possession of illicit whiskey has precious little to do with the state of mind involved in conspiracy with intent to defraud or carrying on the business of a distiller with intent to defraud.

■ Even if we were to assume that the prior conviction had some probative value in the present case, the government has done little to show any actual need for that evidence in view of other available evidence. Terry Lee Smith, the alleged co-conspirator, testified that McDuffie helped weld the still pots, helped mix the mash for fermentation, paid Smith for work at the still, and furnished a condenser, a still cap, wheat shorts, and plastic containers to Smith to be carried to the Macon area. If the jury believed that McDuffie actually performed these acts, they logically would infer from that conduct that he possessed the requisite criminal intent. See Fallen v. United States, 5 Cir. 1955, 220 F.2d 946, 948, cert. denied, 350 U.S. 924, 76 S.Ct. 213, 100 L.Ed. 808.

In its brief on appeal the government lists several instances during McDuffie's trial testimony in which he offered innocent explanations for potentially suspi-

---

14. As Dean McCormick warned,

> [i]f the judges, trial and appellate, content themselves with merely determining whether the particular evidence of other crimes does or does not fit in one of the approved classes, they may lose sight of the underlying policy of protecting the accused against unfair prejudice. The policy may evaporate through the interstices of the classification.

C. McCormick, Evidence § 190, at 453 (2d ed. 1954).

cious acts (e. g., a fingerprint on a jug found at the still site and a $1500 check from McDuffie to Miller). The divergent explanations, however, would appear to relate more to actual participation in the conspiracy than to intent. Moreover, the thrust of McDuffie's defense was alibi, not lack of criminal purpose. Finally, the government's argument that McDuffie's testimony created a prosecutorial need to introduce prior crime evidence bears the stamp of disingenuousness, since the prior conviction was introduced into evidence during the government's case-in-chief before McDuffie ever took the stand.

On the other side of the scale, although the trial court carefully instructed the jury to consider McDuffie's prior conviction only on the issue of intent, we believe there is a substantial possibility that such evidence could lead a jury to believe that the defendant is the type of person who engages in moonshining. And as Judge Rives has said: "Our law makes some allowance for the possibility of reform, and does not yet say 'once a moonshiner, always a moonshiner.'" Baker v. United States, 5 Cir. 1955, 227 F.2d 376, 378–379 (Rives, J., concurring).

All that we demand of trial courts and litigants in this seemingly complex area of criminal jurisprudence is that they deal in reason, not categories. The treasured principles underlying the rule against admitting evidence of other crimes should be relaxed only when such evidence is genuinely needed and would be genuinely relevant.

> This Court has never hesitated to approve the admission of other-crime evidence when that evidence has been relevant under one of the exceptions to the general rule. We have recognized, however, and we must continue to recognize, that the various categories of exceptions—intent, design or plan, identity, etc.—are not magic passwords whose mere incantation will

open wide the courtroom doors to whatever evidence may be offered in their names.

United States v. Goodwin, supra, 492 F. 2d 1155.

## IV. SUSAN McDUFFIE WEEKS

In addition to her Business Records Act claim [15] and her discovery claim,[16] defendant Susan McDuffie Weeks contends that the government failed to offer sufficient evidence to support a conviction for conspiracy, and that the trial court therefore erred by denying her motions for judgment of acquittal. Having examined the record with great care, we concede that the issue is extremely close; but we conclude ultimately that the evidence was sufficient to go to the jury and that the trial court did not err by refusing to order a judgment of acquittal.

In analyzing the evidence against defendant Weeks, we begin with the oft-quoted standard set forth by the Supreme Court in Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704:

> The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. . . . Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a "development and collocation of circumstances".

As in every case resting on circumstantial evidence it is unnecessary to find either the smoking pistol or the bottle of non-tax-paid whiskey in the hand of the defendant. This Court has held that, once a conspiracy is established, the government need only show "slight evidence" that a particular person was a member of the conspiracy. United States v. Morado, 5 Cir. 1972, 454 F.2d 167, 175, cert. denied, 406 .U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116; United States v. Warner, 5 Cir. 1971, 441 F.2d

---

15. See Part I A, supra.

16. See Part I B, supra.

821, 830, cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58. As we cautioned in *Morado*, however,

[o]ur adherence to the "slight evidence" rule should make us nonetheless insistent that guilt remain "individual and personal" and that the government show beyond a reasonable doubt that each and every alleged member of the conspiracy had the deliberate, knowing, specific intent to join the conspiracy.

454 F.2d at 175.

The government's evidence in the case *sub judice* clearly indicates that a conspiracy existed and that defendant Weeks performed acts whose effect was to further that conspiracy. Weeks' claim of insufficient evidence rests on the argument that the government failed to prove that she had knowledge of the conspiracy or that she intentionally acted to further its objectives, both of which are prerequisite to conviction. *See* Causey v. United States, 5 Cir. 1965, 352 F.2d 203, 207; Duke v. United States, 5 Cir. 1956, 233 F.2d 897, 901. Although we recognize that knowledge of a conspiracy is seldom capable of direct proof and must usually appear from surrounding circumstances, United States v. Martinez, 5 Cir. 1973, 486 F.2d 15, 24, we also demand that "the evidence of knowledge must be clear, not equivocal. . . . because charges of conspiracy are not to be made out by piling inference upon inference . . . ." Ingram v. United States, 1959, 360 U.S. 672, 680, 79 S.Ct. 1314, 1320, 3 L.Ed.2d 1503, *quoting* Direct Sales Co. v. United States, 1943, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674.

Defendant Weeks is the daughter of defendant McDuffie, and until late 1972 or early 1973 was employed as a secretary by defendant Miller in his business as a manufacturer's representative. Much of the government's evidence of Weeks' involvement in the conspiracy related to Weeks' activities in her secretarial capacity. First, the government introduced evidence to show that Weeks had rented a post office box at Kathleen, Georgia, in the name of John Carroll, Vice President, Trans Aero Corporation. (Defendant Miller allegedly had used Trans Aero as a cover for certain of his illicit operations). Weeks testified, however, that in renting the post office box at the direction of her employer, she was doing only what she had often done before as a courtesy for companies represented by Miller; she frequently signed the names of corporations and their officers in connection with her work. Weeks made no effort to conceal her identity when she rented the box; she followed her signing of John Carroll's name with the word "by" and her initials.

The government also showed that Weeks had arranged with Flint Electric Company to have electricity turned on, in the name of Trans Aero Corporation, at the Kathleen, Georgia warehouse where the distillery was later discovered. Weeks noted that she had had electricity connected on several previous occasions at Miller's direction, that she again accompanied the corporate signature with her own initials, and that she was well known at Flint Electric, where she regularly paid her own electric bills in person.

In addition, evidence was presented which established that Weeks had partially filled out money orders to Walter Puhan, the owner of the property on which the still was found, and that those money orders bore notations indicating that they were in payment for the Kathleen, Georgia warehouse for specified periods of time. Weeks gave uncontradicted testimony, however, that Miller customarily placed bills on her desk with checks or money orders attached for her to fill out.

The government also offered evidence that Weeks had a citizens' band radio antenna on her house similar to one found at the location of the illicit still twelve miles from Weeks' home. No evidence was introduced, however, to indicate that her antenna was connected to radio equipment; moreover a represent-

ative of the distributing company testified that such radios could not be used for private conversations and that the average antenna range was only five miles. The government also introduced telephone company records to establish that numerous toll calls had been made between Weeks' residence and defendant McDuffie's residence, a situation not difficult to understand in view of the parent-child relationship, and particularly at a time when daughter Weeks (at that time, Susan McDuffie) was planning her wedding.

If the evidence thus far described had been the only information adduced at trial, we would be compelled to conclude that the jury *must* have entertained a reasonable doubt as to Weeks' knowledge of the conspiracy. None of that evidence is inconsistent with the hypothesis urged by Weeks that she was acting innocently in her capacity as McDuffie's daughter and Miller's secretary.

Two final items of evidence, however, when considered together, demonstrated enough inconsistency in Weeks' theory to make the government's case strong enough to submit to the jury. First was the testimony of witness Henry McDowell, with whom Miller had discussed his distillery operations and from whom Miller sought to obtain large quantities of sugar and plastic jugs. Asked whether, in a meeting on January 2, 1973, Miller had given him any instructions as to how to contact him, McDowell replied:

> He told me if I would call his office and I had any information for him at all just to give it to his secretary, that there would be no problem, that she knew what was going on and just give her that information. (Record, Vol. III, p. 303).[17]

Weeks argues that McDowell's testimony is meaningless as to her participation in the conspiracy, since she terminated her employment with Miller at Christmas of 1972, and the record is silent as to the identity of Miller's secretary on January 2, 1973.

A second piece of evidence, however, appears to cast doubt on Weeks' argument. Philip White, a handwriting expert, testified that, through a comparison of writing samples, he had determined that Weeks "probably" wrote [18] a money order sent to Walter Puhan (the owner of the still site property) on January 8, 1973. From this testimony the jury could reasonably have reached either of two damaging conclusions: 1) that Weeks had misstated the date of her termination as Miller's secretary and that she was in fact in Miller's employ on the date of Miller's incriminating comment to McDowell; or 2) that Weeks filled out money orders in furtherance of the illicit distillery operation, not as an innocent secretary, but even beyond her secretarial tenure as a knowing member of the conspiracy. In either case the jury could have decided that Weeks, if less than a majordomo, was more than a cubicle secretary or an unsuspecting pawn.

We emphasize that we consider the government's case against Weeks to be far from overwhelming. In reading and analyzing the record, we found the barometric pressure of guilt rising and falling. As in all sufficiency of the evidence cases, our opinion is tied closely to its facts. Although we have not written an opinion for all seasons, or for all stills, we are satisfied that the jury could, on the basis of the government's

---

17. Weeks raised no objection, either at trial or on this appeal, to the introduction of McDowell's testimony; and the declarant, defendant Miller, took the stand and was available for cross-examination on this subject. Therefore, we need not consider whether the evidence fell within the confines of the federal co-conspirator exception to the hearsay rule.

18. White stated that he had six categories of characterizations for handwriting comparisons: that the person who made the writing on A *made* the writing on B; *probably made* the writing on B; *could have made* the writing on B; *probably did not make* the writing on B; *did not make* the writing on B; or that White is *unable to determine* who made the writing on B.

evidence, have felt the wintry blast of Weeks' guilt beyond a reasonable doubt.

## V. CONCLUSION

The judgment is affirmed as to defendant Weeks. As to defendants Miller and McDuffie, the judgments are reversed and the case remanded for further proceedings not inconsistent with this opinion.

Affirmed in part; reversed in part, and remanded for new trial.