[No. 3558-1. Division One. July 12, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. LEROY MCCRAY, *Appellant.*

*Max D. Crittenden, Inc., P.S., Roger Hawkes,* and *Woodrow Wallen,* for appellant.

*Christopher T. Bayley, Prosecuting Attorney,* and *Douglas J. Smith, Deputy,* for respondent.

ANDERSEN, J.—

### FACTS OF CASE

The questions for decision go to the existence and extent of an individual's right of privacy in his or her own bank account.

The defendant signed a check in the amount of $385.84 payable to Western Airlines. On March 22, 1974, he gave the check to the airline at Seattle-Tacoma International

Airport in exchange for an airline ticket which he then used.

When the check was presented for payment to the bank on which it was drawn, the bank stamped "payment stopped" on the check and returned it to the airline. Then later, presumably when the check was again presented to the bank, the bank attached a slip marked "account closed" and noted thereon the date of May 7, 1974, as the date of closure.

Airline personnel spent over 3 months unsuccessfully trying to collect on the check. During the course of their efforts, they ascertained the following. The ticket had been ordered, picked up, paid for with the check, and used, all without the amount of the fare being questioned. The fare charged was in accordance with filed tariffs. Payment had been stopped on the check by the defendant for the stated reason that the check had been "lost." Numerous telephone calls and letters to the defendant went unanswered by him. A visit by airline personnel to the defendant's business premises, the address of which was printed on the check, indicated that the premises were probably unused.

Eventually the airline did receive a letter from the defendant. In his letter, the defendant in vague terms questioned the amount of the fare charged, noted that he had contacted the prosecuting attorney's office concerning the check, and claimed that office had advised him the matter was a civil one.

Thereupon on July 15, 1974, the airline filed a bad check report with the Port of Seattle Police Department. During the course of the police investigation, a detective contacted the defendant's bank. Bank personnel advised the officer that the defendant's account had been closed by the bank because of not sufficient fund (nsf) checks and that at no time, from the date of the check in question to the closure of the account, were there sufficient funds in the account to cover the check.

Subsequently, the King County Prosecuting Attorney charged the defendant with the crime of grand larceny

based on the check given to Western Airlines. RCW 9.54.010(2); RCW 9.54.090.

At trial, the State's evidence showed that the defendant had on other occasions also purchased tickets from other airlines by check, had also stopped payment on those checks, and had also then proceeded to use the tickets. On these other occasions, the reason given by the defendant to the bank for stopping payment was "dispute," the disputes allegedly being with the airlines as to the correctness of the fares.

Bank personnel and records subpoenaed for the trial also established that the defendant had three separate checking accounts at his bank, all of which were closed by the bank in May of 1974 due to the defendant's abuse of the accounts caused by writing nsf checks thereon. The evidence showed that on the account on which the Western Airlines' check had been drawn, the defendant had 6 overdrafts in 1973 and 31 in 1974. On a second account, he had 65 overdrafts in 1973 and 63 more in 1974. On the third account, he had 15 overdrafts in 1973 and 27 in 1974. On the date the check to Western Airlines was issued, the balances in all three accounts together were insufficient to cover that check.

A bank officer testified that the defendant's checking account had been closed by the bank in 1973, but was reopened after the defendant promised to abstain from writing any more nsf checks. The bank officer said he told the defendant that abused accounts became matters of record. It was also put in evidence, though no charge had been based thereon, that the bank suffered approximately a $500 loss on the defendant's three accounts. The testimony was conflicting as to whether the bank's loss was due entirely to unpaid service charges occasioned by the nsf checks or whether some of the loss was also caused by some nsf checks being honored by the bank.

A jury found the defendant guilty of grand larceny, as charged, and he brings this appeal.

Two issues are dispositive of the appeal.

## ISSUES

ISSUE ONE. Do the police have a right to inquire of a bank as to the status of an account therein, on which a bad check has been drawn, without first obtaining a search warrant or other legal process?

ISSUE Two. Did the trial court err in admitting rebuttal testimony and evidence offered by the State concerning other bad checks later passed by the defendant to another airline?

## DECISION

ISSUE ONE.

CONCLUSION. A call by the police to a bank for the purpose of ascertaining the status of an account in the bank, where an obviously bad check has been drawn or issued on such account by a person authorized to sign checks on it, does not violate the constitutional right of privacy of the person who drew or issued such check.

This is a case of first impression.

We start with the guaranties against unlawful search and seizure contained in our federal and state constitutions:

> The right of the people to be secure in their persons, houses, *papers*, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

(Italics ours.) U.S. Const. amend. 4.

> No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

Const. art. 1, § 7.

Since 1886, it has been settled that "compulsory production of a man's private papers to establish a criminal charge against him . . . is within the scope of the Fourth Amendment to the Constitution . . ." *Boyd v. United States*, 116 U.S. 616, 622, 29 L. Ed. 746, 6 S. Ct. 524 (1886).

It is the defendant's position that the obtaining of information by the police from the defendant's bank without a search warrant or other legal process such as a subpoena

was an illegal search and seizure. He argues therefrom that the trial court erred in refusing to suppress such evidence as well as all other evidence obtained from the bank as fruits of the initial search. The defendant relies on two recent cases, *United States v. Miller*, 500 F.2d 751 (5th Cir. 1974) and *Burrows v. Superior Court*, 13 Cal. 3d 238, 529 P.2d 590, 118 Cal. Rptr. 166 (1975).

In *Miller*, the Fifth Circuit held, on Fourth Amendment grounds, that copies of the defendant's checks obtained by means of a faulty subpoena duces tecum constituted an unlawful invasion of the defendant's privacy. In *Burrows*, the California Supreme Court held, on the basis of article 1, section 13 of the California Constitution, that copies of bank statements informally obtained from the defendant's bank by the authorities were acquired as a result of an illegal search and seizure.[1] The courts in *Miller* and *Burrows* suppressed the illegally obtained evidence and the evidence resulting from investigative leads provided thereby.

We agree with the basic premise of *Miller* and *Burrows*. A person's bank account *is* protected against unwarranted searches and seizures by our federal and state constitutions. U.S. Const. amend 4; Const. art. 1, § 7.

In both *Miller* and *Burrows*, however, information obtained from the bank accounts was used to link the defendants with other crimes. In neither case, as here, was a check drawn on the bank account in question used as the instrument by which the crime itself was committed. *Miller* and *Burrows* are thus distinguished from the case before us for decision.

We are not unmindful of the seriousness and importance of the question presented.

As Justice Powell of the United States Supreme Court recently wrote in his concurring opinion upholding the Bank Secrecy Act of 1970:

---

[1]California is one of the few states which has imposed a higher standard on searches and seizures than is required by the federal constitution. *See* discussion in *State v. Hehman*, 14 Wn. App. 770, 772, 544 P.2d 1257 (1976).

Financial transactions can reveal much about a person's activities, associations, and beliefs. At some point, governmental intrusion upon these areas would implicate legitimate expectations of privacy.

*California Bankers Ass'n v. Shultz*, 416 U.S. 21, 78-79, 39 L. Ed. 2d 812, 94 S. Ct. 1494 (1974). As Justice Mosk of the California Supreme Court even more recently expressed:

Cases are legion that condemn violent searches and invasions of an individual's right to the privacy of his dwelling. The imposition upon privacy, although perhaps not so dramatic, may be equally devastating when other methods are employed. Development of photocopying machines, electronic computers and other sophisticated instruments have accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds. Consequently judicial interpretations of the reach of the constitutional protection of individual privacy must keep pace with the perils created by these new devices.

(Footnote omitted.) *Burrows v. Superior Court*, 13 Cal. 3d 238, 247-48, 529 P.2d 590, 596, 118 Cal. Rptr. 166 (1975). *See also* S. Warren & L. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 195 (1890).

The purpose of the Fourth Amendment and article 1, section 7 of our state constitution is to assure the privacy of individuals against arbitrary invasions by governmental officials. *Camara v. Municipal Court*, 387 U.S. 523, 528, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967); *State v. Serrano*, 14 Wn. App. 462, 465, 544 P.2d 101 (1975).

Balanced against the individual's right of privacy, however, is the public's interest in effective law enforcement, which in a proper case can justify certain kinds of warrantless intrusions on an individual's privacy. *State v. Lesnick*, 84 Wn.2d 940, 942, 530 P.2d 243 (1975); *State v. Serrano*, *supra* at 465.

In the landmark decision of *Katz v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967), the United States Supreme Court markedly extended the protection of the Fourth Amendment and the citizen's right to privacy. Yet even *Katz* recognized that

[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.

*Katz v. United States, supra* at 351. *Accord, State v. Edwards,* 5 Wn. App. 852, 490 P.2d 1337 (1971).

The issue then,

in terms of the principles announced in *Katz,* is what expectations of privacy are constitutionally "justifiable" —what expectations the Fourth Amendment will protect in the absence of a warrant.

*United States v. White,* 401 U.S. 745, 752, 28 L. Ed. 2d 453, 91 S. Ct. 1122 (1971).

In the present case, the stop payment order based on the defendant's claim of a "lost" check was obviously spurious from the outset. Western Airlines was the named payee on the check and had the check in its possession from the time the defendant issued it.

One who draws or issues a bad check knows full well that in the ordinary course of banking practice, when such a check is presented for payment to the bank on which it is drawn, it will almost certainly be dishonored by nonpayment and returned to the payee or holder of the check. Such person must also know that when the bank returns the check, the reason for the check being dishonored will customarily appear either on the face of the check, or on a slip attached to it, for all who handle the check to see.[2]

It seems clear to us that a person who writes or passes a bad check drawn on his or her bank account cannot have any justifiable expectation that the status of the account at that time will remain private. Quite aside from any legal consequences, the practical effect of putting such a check into the stream of commerce is to virtually insure that the state of the account will not remain private.

This is not a case of an arbitrary intrusion by a police officer into the defendant's privacy. It is true that the call

---

[2]*See, for example,* the itemized notice of dishonor forms used for checks in Uniform Commercial Code practice. 7 Shattuck & Cosway, Wash. Prac., Uniform Commercial Code Forms, Forms 1 and 2, § 3-507 (1967).

by the officer to the bank in order to determine the state of the bank account on which the check was drawn was a search in the eyes of the law. The inquiry or search in the present case was not unreasonable in extent, however. *See Terry v. Ohio*, 392 U.S. 1, 9, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *Elkins v. United States*, 364 U.S. 206, 222, 4 L. Ed. 2d 1669, 80 S. Ct. 1437 (1960); *State v. Henneke*, 78 Wn.2d 147, 149, 470 P.2d 176 (1970); *State v. Edwards, supra.*

Neither was the bank, which was itself victimized by the defendant, required to stand mute when the police inquired as to the state of the defendant's account on which the bad check in question had been drawn. The courts are not in unanimous agreement as to a bank's exact obligation of secrecy with respect to the account of a depositor at all times under all circumstances. The reported decisions are in general agreement, however, that a bank has an obligation to its customers and depositors to at least not unnecessarily, promiscuously or maliciously disclose their financial condition. *Bank's duty to customer or depositor not to disclose information as to his financial condition*, Annot., 92 A.L.R.2d 900 (1963). The bank's obligation here was certainly no higher than this and such obligation was not violated.

We hold that a call by the police to a bank for the purpose of ascertaining the status of an account in the bank where an obviously bad check has been drawn or issued on such account by a person authorized to sign checks on it does not violate the constitutional right of privacy of the person who drew or issued such check.

The trial court did not err in denying the defendant's motion to suppress the evidence.

ISSUE Two.

CONCLUSION. The admission of rebuttal testimony and evidence showing the defendant had passed other bad checks to another airline did not amount to an abuse of discretion since the subject was opened by the defendant's own testimony and such evidence was relevant to issues in the case.

The State, in its rebuttal case, called a Braniff Airlines ticket agent as a witness. She identified two "account closed" checks given to Braniff in the amounts of $326.56 and $519.30 in May of 1974. She also identified the defendant as having been the one who gave her the checks in exchange for airline tickets.

The admission and determination of the propriety of rebuttal testimony and evidence rests within the discretion of the trial court. *State v. White*, 74 Wn.2d 386, 394, 444 P.2d 661 (1968); *State v. Bergen*, 13 Wn. App. 974, 978, 538 P.2d 533 (1975).

The questioned testimony and exhibits related to a subject opened by the defendant in his own testimony. Further, evidence that other worthless checks were issued by the defendant at about the same time as the check upon which the prosecution is based is relevant and competent to show his intent and general plan of operations. *State v. Scherer*, 77 Wn.2d 345, 351, 462 P.2d 549 (1969); *State v. Hannigan*, 3 Wn. App. 529, 530, 475 P.2d 886 (1970).

The trial court did not abuse its discretion in admitting the checks given to Braniff Airlines into evidence or in allowing the testimony establishing that it was the defendant who passed those checks.

Affirmed.

FARRIS and CALLOW, JJ., concur.

Petition for rehearing denied September 1, 1976.