IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                     Respondent,<br><br>v.<br><br>HARLAN W. BLACKBURN,<br><br>                     Appellant. | No. 86238-3-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

COBURN, J. — Harlan Blackburn repeatedly sexually assaulted his biological daughter from the time she was 12 to 20 years old. In their investigation of Blackburn, law enforcement obtained without a warrant the last four digits of his bank card and its purchase history at a Lovers store. The trial court admitted the evidence over Blackburn's general objection. A jury convicted Blackburn of five counts of incest in the first degree, two counts of rape of a child in the second degree, and one count of rape of a child in the third degree. We agree with Blackburn that in proceeding without a warrant law enforcement violated his right to privacy under article I, section 7 of our state's constitution constituting a manifest constitutional error but hold that the admission of the inadmissible evidence was harmless. Blackburn also argues that (1) there was insufficient evidence to sustain three of his convictions and (2) remand is necessary to resentence Blackburn within the statutory maximum on five of his convictions. We reverse Blackburn's conviction on Count 8 for insufficient evidence and

remand for resentencing on counts 2, 3, 5, 6, and 7. In all other respects, we affirm.

FACTS

Blackburn's biological daughter C.B. was born on August 10, 2001. C.B. lived with her mother in Idaho for the first few years of her life. When she was about three years old, C.B. began living with Blackburn in Washington on a permanent basis. A court later awarded Blackburn full custody of C.B.

Starting around when she was in second grade, C.B. and her father lived with her paternal grandparents Jeana Blackburn (grandmother) and Stephen Blackburn (grandfather) in a house on Petrovitsky Road in the Renton area (the Petrovitsky house). Blackburn had sexual intercourse with C.B. multiple times when they lived in the Petrovitsky house starting when he digitally penetrated C.B. when she was 12 years old in 2013 or 2014. Blackburn progressed to penetrating C.B. with his penis. Blackburn's then girlfriend Caitlin Nitz moved into the Petrovitsky house in 2015, toward the end of C.B.'s eighth grade year.

In 2018, when C.B. was 16 or 17 years old, she, Blackburn, her paternal grandparents, and Nitz moved into a house in Kent (the Kent house). Nitz later moved out of the Kent house sometime in 2018 or 2019.

Blackburn continued to sexually assault C.B. when they lived at the Kent house. At the Kent house, C.B. had her own bedroom but would sleep in Blackburn's bed "the majority of the time" because Blackburn would get upset if C.B. tried to move back into her room. C.B. would sleep on top of the covers while Blackburn slept under the covers to put "an extra layer" between them.

2

C.B. later testified generally that there were times that Blackburn would have vaginal intercourse with her on top of a blanket that had an image of a dragon that was on Blackburn's bed in the Kent house. She also testified that Blackburn penetrated her vagina with a white dildo when she was around 17 or 18 years old. Over time Blackburn used other sex toys on C.B., including vibrators, butt plugs, and other dildos. Blackburn provided the sex toys and C.B. thought he got them from "[l]ike, the Lovers store or something." C.B. also later testified that Blackburn would talk "dirty" to her, asking her "to be his dirty little girl or say, ['']Are you going to let Daddy fuck your pussy tonight?['']"

Before she graduated high school in June 2019, C.B. told her friend that she was being sexually assaulted. After graduation, C.B. continued to live in the Kent house where she worked as a paid caregiver for her grandmother.

For C.B.'s 20th birthday in 2021, Blackburn reserved a room at the Westin Hotel in Seattle. On August 13, 2021, Blackburn drove C.B. to Seattle and had her wait in the car while he checked in at the hotel. Blackburn then took C.B. to dinner at Daniel's Steakhouse. After dinner, Blackburn took C.B. back to the hotel. C.B. did not want to go to the hotel because she knew that Blackburn "wanted to have a night where he could do whatever [sexual acts or intercourse] he wanted."

When she got to the room at the Westin Hotel, C.B. saw that there was only one bed in the room. C.B. also saw a black paper bag on the bed from the Lovers store. The bag contained sex toys, lubricant, and lingerie. When Blackburn and C.B. got to the room, Blackburn went to the bed and emptied out the bag. The lingerie included three

dresses, including a blue fishnet dress[1] and a black fishnet dress with spaghetti straps. Blackburn asked C.B. to put on one of the dresses. After she put on the dress, Blackburn had vaginal intercourse with C.B. Blackburn then asked C.B. to change into the other dress and proceeded to have anal intercourse with her. C.B. testified at trial that Blackburn brought the dresses to the hotel, and she assumed that Blackburn purchased them from Lovers because of the bag they were in.

In early October 2021, C.B.'s boyfriend Mark Rooks asked her if she was also in a relationship with someone else or if something was going on at home because C.B. was being less friendly toward him. C.B. told Rooks that her father had been sexually assaulting her. Hours after she told Rooks, C.B. left the Kent home while Blackburn was sleeping and moved in with Rooks. Soon after she told Rooks, C.B. told her friend about the sexual abuse. C.B. also told her mother and cousin. C.B. had also told Nitz and her paternal grandmother about the abuse before she moved out of the Kent house, but they told her she was lying.

Blackburn later testified that C.B. moved out on October 6, 2021. C.B. did not see Blackburn again after she moved out of the Kent house until trial. A week after she moved out, C.B. reported Blackburn to law enforcement by calling 911.

On November 9 law enforcement arrested Blackburn and executed a search warrant on the Kent house and Blackburn's truck that resulted in the recovery of a dragon blanket found on Blackburn's bed and three cell phones.

---

[1] A photo of a blue dress that C.B. confirmed matched the blue dress she wore at the Westin Hotel was admitted at trial as exhibit 39. This exhibit was not designated in the record on appeal.

On November 12 Blackburn was charged with one count of rape of a child in the second degree (Count 1), one count of rape of a child in the third degree (Count 2), and one count of incest in the first degree (Count 3). The State later charged Blackburn by amended information with four additional charges of incest in the first degree (counts 5, 6, 7, and 8) and an additional charge of rape of a child in the second degree (Count 4).

On November 23 law enforcement, without a warrant, obtained a copy of a room reservation receipt, and a manager's description of the room listed on the reservation receipt. See ex. 25; pretrial exs. 22, 23. The reservation receipt showed Blackburn's name, address, dates of stay at the hotel, room number, room charges, and the last four digits of the bank card—"8923"—that he used to pay for the room. Pretrial ex. 22. The following day law enforcement, also without a warrant, obtained a security video from the Westin Hotel of Blackburn checking in on August 13.

After Kent Police Department Detective Angela Galetti received a copy of the Westin Hotel reservation receipt and information from C.B. indicating that Blackburn purchased an outfit for her to wear from the Lovers store, Galetti went to a Lovers store in Kent on December 6. Galetti did not have a warrant. Galetti met with the store manager and provided an image of the blue dress that she had found online that matched the dress described by C.B. The store manager found the dress in the store and Galetti photographed it. Galetti then asked the store manager to look up the purchase history of that dress for the suspected purchase date range of August 1, 2021, to August 13, 2021. The store manager located a matching purchase receipt dated August 12, 2021, for items that were purchased with an unidentified "Debit Card" for

$155.79. Ex. 17. Vicky Murray,[2] an employee at Lovers' corporate office, later testified that the items on that receipt included a toy that is a personal vibrator, an open-top piece of lingerie, a dress, a mini dress, and charge for a bag. Murray explained the store was required to charge customers when the store provided a bag. Galetti requested the payment information for the Lovers receipt. Murray emailed Galetti with the last four digits of the bank card, "8923," used to make the August 12, 2021, purchase. Ex. 18.

Detective Galetti obtained a search warrant on December 8 to extract data from Blackburn's previously recovered cell phones, which resulted in the extraction of two tax payments made by Blackburn with a bank card with the last four digits of "8923." Ex. 37. The last four digits on the tax payments, "8923," matched the last four digits of the bank card associated with the Lovers purchase. See exs. 18, 37.

Also in December, C.B.'s boyfriend Rooks contacted Galetti about a sexually explicit video that he found on C.B.'s cell phone. The video was taken on March 23, 2019. C.B. later testified that the video showed her and Blackburn in his bedroom.[3] C.B. provided Galetti with photos from a different time to show that C.B. wore the same shirt as the one she wore in the video.

Before trial, Blackburn moved under CrR 3.6 to suppress evidence that law enforcement obtained from the Westin Hotel, including the room reservation receipt, and the tax payment information extracted from Blackburn's cell phone—both of which, as stated above, contained the last four digits of Blackburn's bank card of "8923." See pretrial ex. 22; ex. 37. Blackburn argued that the Westin Hotel room reservation receipt

---

[2] Murray identifies herself as "Vicky" and also "Christine."
[3] The video, admitted at trial, was not designated on appeal. At trial the parties agreed the video depicted Blackburn but disputed the identity of the other person in the video.

should be suppressed because the last four digits of Blackburn's bank card constituted constitutionally protected private information unlawfully obtained without a warrant. Blackburn also argued that law enforcement extracted the tax payment information containing the last four digits of Blackburn's bank card prior to the trial court's issuance of the search warrant. He argued law enforcement provided the partial bank card number from the Westin receipt or tax payment information to Lovers to match purchase records. Thus, Blackburn argued, the Lovers purchase information should be suppressed as fruit of the poisonous tree.

The trial court granted Blackburn's motion to suppress the Westin receipt but denied his motions to suppress the additional information obtained from the Westin Hotel search and the tax payment information extracted from Blackburn's cell phone. The trial court found that law enforcement searched the cell phone after the search warrant was obtained on December 8, 2021, which Blackburn does not challenge on appeal. The court also declined to suppress the Lovers purchase information, finding that Lovers employee Murray's pretrial testimony did not establish whether law enforcement provided the bank card information to Lovers or vice versa and concluding that the "information was not fruits of the poisonous tree but rather components of the investigation conducted by [the] Kent [Police Department]."

Blackburn's trial was held in November and December 2023, during which he testified in his own defense. Blackburn denied the sexual allegations and testified he had no idea why C.B. would say that he raped her. He testified that his relationship with C.B. was closer than the average father-daughter relationship and that they shared a

bed. Blackburn said the last time they shared a bed was a few days before C.B. left the Kent house on October 6. He testified he did not know why C.B. moved out.

At trial the tax payment information, the Lovers receipt listing the purchased items, and the security video of Blackburn checking in at the Westin Hotel on August 13 were admitted into evidence. Exs. 37, 17, 25. A photo that Detective Galetti took of the blue dress at the Lovers store that matched C.B.'s description was also admitted at trial, as was a photo of the dragon blanket on Blackburn's bed that law enforcement found during their search of the Kent house.[4]

Prior to the State questioning Lovers corporate employee Murray about the bank card digits associated with the Lovers purchase, defense counsel objected "to the last four digits even being mentioned." Given the trial court's previous CrR 3.6 ruling, defense counsel said she did not think she had a basis to object but was "objecting anyway." The trial court overruled the objection as one that was "noted without a specific basis." Murray testified that her email to Galetti stated that the last four digits of the bank card used for the Lovers purchase were "8923." A copy of Murray's email was later admitted without objection during the State's direct examination of Galetti. See ex. 18.

Blackburn provided his own version of events to explain his reservation at the Westin Hotel on August 13 and the Lovers purchase. Blackburn testified he made the Westin Hotel reservation for C.B. and her friends to celebrate C.B.'s birthday. According to Blackburn, the plan was for C.B. and her friends to stay at the hotel and for him to meet an escort "Vanessa" in Tukwila. Blackburn said that the "toy" listed on the receipt

---

[4] These exhibits were not designated in the record on appeal.

8

was for his appointment with Vanessa and he purchased the other items for a barista who worked at a coffee stand that he frequented.

Blackburn said he cancelled the appointment with Vanessa because C.B.'s friends were not available to come to the Westin Hotel. Blackburn still checked in at the hotel because "it was past the 24 hours to cancel" for a refund. He testified he made a "last-minute [dinner] reservation" at "Daniel's." After Blackburn checked in, he said he went back to his truck and "got my bag and [C.B.], and then we went up to the room and got ready for dinner." After dinner, he and C.B. went to a cannabis dispensary where he purchased cannabis that they then smoked in the hotel parking garage. Blackburn and C.B. then changed in the hotel room and went to 7-Eleven to get snacks.

The prosecution presented Facebook records of sexually explicit "Facebook Messenger" messages between C.B. and Blackburn.[5] The records were obtained with a warrant from C.B.'s account because Blackburn had either deleted or deactivated his account. In one message sent in January 2021, Blackburn tells C.B., "[B]utt stuff when I get home, ready or not. LOL." C.B. says, "Okay." Blackburn then tells C.B., "You should find the numbing lube or grab some from the Lovers store."

Blackburn presented testimony from forensic expert Jason Beebe that he assisted Blackburn and his fiancée with downloading Blackburn's Facebook-archived messages between him and C.B. from January 2021 to October 2021, and the downloaded messages did not include the sexually explicit messages presented by the State. On cross examination Beebe admitted he instructed Blackburn and his fiancée on how to download the Facebook archives and that he did not have access to the

---

[5] Copies of the Facebook messages were admitted at trial. These exhibits were not designated on appeal.

9

archives or see what was in the download. What Beebe examined was what was provided by Blackburn's fiancée,[6] and Beebe had no way of knowing why the messages from the Facebook records the State obtained did not exactly match the messages that he received from Blackburn's fiancée. On redirect Beebe said the download he received was unusual in that it did not indicate if there were messages that had been removed by the user or unsent, which is information that is normally included. During cross examination, Blackburn acknowledged that Facebook business records presented by the State showed him telling C.B. to make him a video in response to her request to go to a friend's house.

The State also played for the jury multiple jail calls between Blackburn and his mother Jeana Blackburn. In one jail call, the following exchange occurs:

> JEANA BLACKBURN: I read the search order.
> HARLAN BLACKBURN: Okay. Well, I don't want to talk about it right now.
> …
> JEANA BLACKBURN: But I don't agree that it's all your fault, you know.
> HARLAN BLACKBURN [Unintelligible] –
> JEANA BLACKBURN: If it really happened. Well … I have to agree now that it happened, but I'm just disappointed that you would do something like that to your daughter. And I'm not going to scold you here.
> HARLAN BLACKBURN: I understand.
> JEANA BLACKBURN: It's just – it's just –
> HARLAN BLACKBURN: Just like you said, though, it wasn't – it wasn't just me. It was – it takes two. And it's not --
> JEANA BLACKBURN: Oh, yeah. And I told the …. detectives that last night.
> HARLAN BLACKBURN: It's not what she says on the report, and it's ridiculous.

---

[6] At trial Blackburn identified the person who assisted him with the download as his wife "Liz."

When asked what he meant by "it takes two," Blackburn testified, "It just … it would have took two. Like, if – if these allegations were – if – if there was something sexual in nature that we were engaged in, it woulda took two, that there was no – no way that I would have done the things that were alleged." Blackburn said he was not referring to himself as one of the two people who would have been participating.

The State also played for the jury the sexually explicit video taken on March 23, 2019, that Rooks found on C.B.'s cell phone, which was admitted. Photos that C.B. provided to Galetti showing C.B. wearing the same shirt as in the video were also admitted.[7] Defense played audio from the video that was enhanced by a forensic expert. The enhanced audio was admitted into evidence.[8] Blackburn claimed the sexually explicit video was of him with the escort Vanessa that he recorded with a spare iPhone. In closing Defense argued that Blackburn can be heard saying the name "Vanessa" at the end of the enhanced audio. The State said to the jury in closing to listen carefully to the video, arguing that Blackburn can be heard saying twice to C.B., "Let Daddy fuck your pussy," like what C.B. testified Blackburn would say when he talked dirty to her.

The jury convicted Blackburn on all eight counts. The trial court sentenced Blackburn to concurrent prison terms. His longest sentences were for his two convictions for rape of a child in the second degree, subject to indeterminate sentencing under RCW 9.94A.507(1)(a)(i),[9] for which the trial court sentenced Blackburn to a prison term of 210 months to life and lifetime community custody. The trial court imposed the

---

[7] This exhibit was not designated on appeal.
[8] The audio exhibit was not designated on appeal.
[9] RCW 9.94A.507 has been amended since Blackburn's sentencing, as of July 27, 2025, but the relevant statutory language remains the same.

low end of the standard sentencing range for Blackburn's minimum 210-month imprisonment term[10] based on the offense seriousness level XI and Blackburn's offender score of 21, which exceeded the maximum offender score of 9 contemplated by the standard range.[11] See RCW 9.94A.510, .515,[12] .530(1).

Blackburn appeals.

DISCUSSION

Motion to Suppress

Blackburn argues for the first time on appeal that the State violated his right to be free from unlawful governmental intrusion into his private affairs under article I, section 7 of the Washington Constitution when it obtained the last four digits of his bank card from the Lovers store without a warrant or warrant exception. Accordingly, he asserts that Blackburn's partial bank card number associated with the Lovers purchase should have been suppressed under the exclusionary rule.[13] We conclude that the admission of the last four digits of Blackburn's bank card amounted to a manifest constitutional error under article I, section 7, but that the error was harmless.

---

[10] Under the indeterminate sentencing scheme, the sentencing court determines a minimum term of confinement, and the maximum term of confinement is always the statutory maximum sentence for the offense. RCW 9.94A.507(3)(b), (5); see RCW 9A.44.076(2) (class A felony); RCW 9A.20.021(1)(a) (maximum lifetime imprisonment).

[11] Blackburn's convictions in the remaining six counts are addressed below.

[12] RCW 9.94A.515 has been amended since Blackburn's sentencing, but the changes did not affect the seriousness levels for the offenses discussed in this opinion. See LAWS OF 2025, ch. 220, § 7.

[13] Blackburn also claims in his opening brief that the last four digits of his bank card should be suppressed under the fruit of the poisonous tree doctrine. However, because the trial court rejected this argument and Blackburn does not provide substantive argument to address an error in the court's decision, we do not consider it. See RAP 10.3(a)(6).

*A. RAP 2.5(a)*

The State argues that Blackburn waived his claim that the trial court erred in admitting the last four digits of his bank card because it was protected financial information under article I, section 7.

Under RAP 2.5(a), we may refuse to review a claim or error not raised in the trial court. An exception to this rule is when the claimed error is a "manifest error affecting a constitutional right." RAP 2.5(a)(3). Courts must narrowly construe this exception. State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). RAP 2.5(a)(3) is not intended to provide defendants with a means to obtain new trials whenever they can set forth a constitutional issue that was not litigated below. State v. Scott, 110 Wn.2d 682, 687, 757 P.2d 492 (1988). Rather, the exception "encompasses developing case law while ensuring only certain constitutional questions can be raised for the first time on review." State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

Thus, before reviewing the merits of an unpreserved error under RAP 2.5(a)(3), we must ask two questions: (1) has the party claiming the error shown the error is truly of a constitutional magnitude and, if so, (2) has the party demonstrated that the error is manifest? State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). And, even where a defendant satisfies these threshold questions, the error is still subject to review under the constitutional harmless error standard. State v. Gordon, 172 Wn.2d 671, 676 & n.2, 260 P.3d 884 (2011); see O'Hara, 167 Wn.2d at 99 ("[A] harmless error analysis occurs after the court determines the error is a manifest constitutional error. … The determination of whether there is actual prejudice is a different question and involves a

13

different analysis as compared to the determination of whether the error warrants a reversal."). We address each of these inquiries in turn.

*(i) Constitutional Magnitude*

We do not assume a party's assigned error is of constitutional magnitude. O'Hara, 167 Wn.2d at 98. Instead, this court assesses whether the alleged error implicates a constitutional interest as compared to other forms of trial error. Id. To determine if the exception under RAP 2.5(a)(3) is applicable, "[i]t is proper to 'preview' the merits of the constitutional argument to determine whether it is likely to succeed." State v. Kirwin, 165 Wn.2d 818, 823, 203 P.3d 1044 (2009) (quoting State v. Walsh, 143 Wn.2d 1, 8, 17 P.3d 591 (2001)). Here, we are asked to consider whether it is an unlawful disturbance of private affairs when law enforcement obtains without a warrant the last four digits of a person's bank card. Because this question implicates a constitutional interest, we consider the merits of Blackburn's argument.

Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." A search occurs under article I, section 7 if "the government disturbs 'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.'" State v. Hinton, 179 Wn.2d 862, 868, 319 P.3d 9 (2014) (quoting State v. Myrick, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)). "Article I, section 7 'is grounded in a broad right to privacy.'" Id. (quoting State v. Chacon Arreola, 176 Wn.2d 284, 291, 290 P.3d 983 (2012)).

An analysis under article I, section 7 analysis requires a two-part inquiry. State v. Bowman, 198 Wn.2d 609, 618, 498 P.3d 478 (2021) (citing State v. Miles, 160 Wn.2d

236, 243, 156 P.3d 864 (2007)). First, courts must determine if the challenged action disturbs an individual's private affairs. State v. McKinney, 148 Wn.2d 20, 27, 60 P.3d 46 (2002). "This determination is not 'merely an inquiry into a person's subjective expectation of privacy but is rather an examination of whether the expectation is one which a citizen of this state should be entitled to hold.'" Id. (quoting City of Seattle v. McCready, 123 Wn.2d 260, 270, 868 P.2d 134 (1994)). Courts look at the historical treatment of the claimed interest, which in part "focuses on the nature and extent of the information which may be obtained as a result of the governmental conduct." Miles, 160 Wn.2d at 244. Second, if the State has disturbed a valid privacy interest, courts determine whether the disturbance was justified by the authority of law, such as a valid warrant. Id. Under the exclusionary rule, evidence obtained during an illegal search must be suppressed.[14] State v. Gaines, 154 Wn.2d 711, 716-17, 116 P.3d 993 (2005).

In Miles, the Supreme Court held that bank records are considered private affairs protected by article I, section 7. 160 Wn.2d at 244, 247. The court held that private bank records "potentially reveal[] sensitive personal information," such as "what the citizen buys, how often, and from whom" as well as "political, recreational, and religious organizations a citizen supports" and "where the citizen travels, their affiliations, reading materials, television viewing habits, financial condition, and more." Id. at 246-47 (emphasis added). Thus, "[l]ittle doubt exists that banking records, because of the type of information contained therein, are within a person's private affairs." Id. at 247; see State v. Reeder, 184 Wn.2d 805, 811, 814-15, 365 P.3d 1243 (2015) (citing Miles and

---

[14] Further, all subsequently discovered evidence based on the illegal search becomes fruit of the poisonous tree and must also be suppressed. State v. Olson, 33 Wn. App. 2d 667, 679, 565 P.3d 128 (2025); State v. Allen, 138 Wn. App. 463, 469, 157 P.3d 893 (2007).

holding that defendant's bank records revealing withdrawal of money and use of funds in casinos and for personal expenses were protected private affairs under article I, section 7); State v. Meza, 191 Wn. App. 849, 853, 364 P.3d 1081 (2015) (holding that "it defies reason to extend constitutional protection to bank account records but not to [seizures of] the funds reflected in those records. The seizure of funds is as much … a disturbance of a person's private affairs as the seizure of the records regarding those funds") (citing Miles, 160 Wn.2d at 244-47; State v. McCray, 15 Wn. App. 810, 814, 551 P.2d 1376 (1976)).

The Miles court cited State v. Boland, wherein the Supreme Court recognized in its consideration of a privacy interest in garbage put out for collection that "the type of information potentially revealed by rummaging through garbage bags could include sensitive information about business records, bills, correspondence, tax records, and so on." Miles, 160 Wn.2d at 245 (emphasis added) (discussing State v. Boland, 115 Wn.2d 571, 578, 800 P.2d 1112 (1990)).

The Miles court distinguished bank records from Department of Licensing (DOL) driver's licensing records, see id., which it previously determined in State v. McKinney did not reveal or allow law enforcement to "draw inferences" about the intimate details of a defendant's life, their activities, or the identity of friends or political and business associates. McKinney, 148 Wn.2d at 23-24, 29-30, 32. In McKinney, the DOL records included names and addresses of registered vehicle owners associated with license plate numbers, physical descriptions, and license status. Id. at 30, 32. Importantly, the court observed that DOL records are kept by a government agency for use by that agency and law enforcement. Id. at 32. Therefore, "[c]onsidering the purpose for which

16

these records are created, citizens of this state are not entitled to expect that their information is private and protected from disclosure for law enforcement purposes." Id. (emphasis added).[15] Comparatively, the existence of a business relationship with the holder of the information does not alter a person's expectation of privacy regarding the business's disclosure of such information to law enforcement. Miles, 160 Wn.2d at 245 (citing State v. Gunwall, 106 Wn.2d 54, 67, 720 P.2d 808 (1986)).

In support of the private nature of personal bank records, the Miles court also observed that bank records have historically been protected by our legislature from unsupervised access as shown by statutory prohibitions against the disclosure of a person's banking records. Id. at 245-46. The Miles court, turning to the Washington Commercial Bank Act, observed that the legislature designated personal bank records obtained by the State in bank examinations as "'confidential and privileged information.'" Id. at 245. The relevant statute, that has since been recodified as RCW 30A.04.075(1),[16] provides that such records obtained by the director of the state department of financial institutions or their staff "shall not be made public or otherwise disclosed to any person, firm, corporation, agency, association, governmental body, or

---

[15] Citing statutory history and RCW 46.52.101(6), the McKinney court also observed that "[t]he driving public is well aware that vehicle and driver licensing procedures require disclosure of such information, and it is unlikely that a citizen would expect this information is not available for law enforcement purposes." 148 Wn.2d at 27-30. The court held in sum:

> Based on the historical treatment of driver's license records, the fact that these records reveal little about a person's associations, financial dealings, or movements, and the purpose for which the State compiles and maintains these records, we hold that there is no protected privacy interest in the information contained in a DOL driver's record under article I, section 7 of our state constitution.

148 Wn.2d at 32.

[16] Though the statute has been amended since Miles, the relevant language remains the same. We therefore refer to the current recodified version. See LAWS OF 2014, ch. 37, § 2; compare LAWS OF 2014, ch. 37, § 109 with LAWS OF 2005, ch. 274, § 251.

other entity." RCW 30A.04.075(1); see RCW 30A.04.010(7), (8). The Miles court noted that the statute also requires notice to the customer before bank records are disclosed to the state, see RCW 30A.04.075(2)(c), further evidencing legislative protection of personal bank records. 160 Wn.2d at 246. This notice requirement, the court observed, applies to the disclosure of examination reports from various other financial entities. Id.; see RCW 32.04.220(2)(c) (savings banks); RCW 33.04.110(2) (savings and loan associations); RCW 31.12.565(2)(b) (credit unions).[17] "Statutory prohibitions against disclosing a person's banking records further support the private nature of these records." Miles, 160 Wn.2d at 246; see also Miles, 160 Wn.2d at 246 (citing RCW 31.45.030 (regarding check cashers and sellers)).

The State argues that Miles is distinguishable because the last four digits of an unidentified person's bank card do not, on their own, reveal private or personal information about the cardholder like a specific individual's bank record. The State asserted in oral argument that the last four digits of a bank card, without more to connect the card used for a purchase to a specific individual, are "useless." Wash. Ct. of Appeals oral arg., State v. Blackburn, No. 86238-3-I (Nov. 5, 2025), at 11 min., 24 sec. through 11 min., 59 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025111101/. The material concern, however, is not whether the information in a vacuum reveals intimate details about a person's life, but whether such information could potentially reveal sensitive information about a person. See Miles, 160 Wn.2d at 245-47; see also Boland, 115

---

[17] Though RCW 32.04.220 has been amended since Miles, we refer to the current version because the relevant language remains the same. The same applies to RCW 31.12.565.

Wn.2d at 578 ("'Business records, bills, correspondence, magazines, tax records, and other telltale refuse can reveal much about a person's activities, associations, and beliefs.'") (quoting State v. Tanaka, 67 Haw. 658, 662, 701 P.2d 1274 (1985)). The very purpose of the last four digits of a bank card is to provide an identifying link to the cardholder's bank account and records. Here, law enforcement used the "8923" digits associated with the Lovers purchase to identify Blackburn's account. It states the obvious to observe that a partial bank card number in the hands of law enforcement, as shown on this record, is not useless.

In State v. Jorden, the Supreme Court concluded that a motel guest registry reveals intimate details of one's life to support its protection as a private affair under article I, section 7. 160 Wn.2d 121, 129, 156 P.3d 893 (2007). The court recognized "there is more information at stake than simply a guest's registration information: an individual's very presence in a motel or hotel may in itself be a sensitive piece of information." Id. (emphasis added). For example, the court observed, guests may include citizens engaging in extramarital affairs at the hotel or in confidential business negotiations, domestic violence victims seeking safety from their abusers, or celebrities taking a respite from public scrutiny. Id. Further, the registry information "may also reveal co-guests in the room, divulging yet another person's personal or business associates." Id.; see also id. at 129 n.6 (distinguishing court's upholding of random government checks of "plainly visible vehicle license plates" in McKinney, 148 Wn.2d at 27-28, 30).

In the instant case, the Kent Police Department's use of the "8923" bank card digits exemplifies the sensitive personal information at stake in the government's

collection of partial bank card numbers. The partial bank card number potentially revealed not only purchases that Blackburn or the cardholder made but was used to show that Blackburn made purchases at a store that sells products related to intimate acts. See Miles, 160 Wn.2d at 246-47; McKinney, 148 Wn.2d at 27. The record supports that law enforcement unlawfully obtained the last four digits of Blackburn's bank card through its warrantless Westin Hotel search before it obtained the same "8923" digits from the Lovers store. See pretrial ex. 22; exs. 17, 18. Therefore, law enforcement had already connected the partial bank card number to Blackburn and sought to build its investigation by corroborating C.B.'s report that Blackburn had purchased items for her to wear from Lovers. By obtaining the last four digits of the bank card used for the Lovers purchase, law enforcement uncovered, without a warrant, deeply personal information about Blackburn's life.

As a piece of banking and financial transaction information, the last four digits of a person's bank card can potentially reveal an abundance of intimate information, such as one's whereabouts, activities, habits, interests, and financial status. See Miles, 160 Wn.2d at 246-47. The State offers no authority to support its claim that the last four digits of a bank card do not constitute a financial record. See DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."). Akin to Miles, there is little doubt that the last four digits of a person's bank card, because of the type of information potentially revealed or reasonably inferred, deserves protection as a Washington

citizen's private affair under article I, section 7. See Miles, 160 Wn.2d at 245; McKinney, 148 Wn.2d at 32.

Apparently as evidence of the lack of historical protection afforded to the last four digits of a bank card, the State cites RCW 19.134.100 of the Credit Services Organizations Act, arguing that the statute demonstrates "our legislature has recognized that redacting all but the last four digits of financial numbers effectively neutralizes any real danger of revealing the full number while allowing for accurate recordkeeping." The statute states in relevant part:

> To protect against fraud and identity theft, when a credit services organization sends a written communication … that contains personal information of a consumer, the credit services organization shall redact the personal information to include only the last four digits of the social security number, taxpayer identification number, or state identification number, the last four digits of the financial account number, credit card number, or debit card number, or the month and year of the consumer's date of birth, unless the inclusion of the full number or date is otherwise required by law, or is legally permissible and required to achieve the desired objective.

RCW 19.134.100. However, the purpose of the redaction mandate under RCW 19.134.100 is not to authorize the government's gathering of the last four digits of bank cards but "[t]o protect against fraud and identity theft."[18] See Jorden, 160 Wn.2d at 126-27 ("[W]here the perceived [privacy] interest [under article I, section 7] involves the gathering of personal information by the government, this court has also considered the purpose for which the information sought is kept, and by whom it is kept."); McKinney,

---

[18] Likewise, we are not persuaded by the State's references to GR 31(e) and WACs 456-09-557 and 456-10-415, which address procedures for a party to disclose financial account numbers in court or hearing documents if the party believes such disclosure is necessary or the disclosure is otherwise ordered by the presiding entity. See GR 31(e)(1)(B) ("Access to Court Records"); WAC 456-09-557 (stating regulations for formal hearings before the Board of Tax Appeals), 456-10-415 (stating regulations for informal hearings before the Board of Tax Appeals); Title 456 WAC.

148 Wn.2d at 32 ("Considering the purpose for which these [DOL] records are created, citizens of this state are not entitled to expect that their information is private and protected from disclosure for law enforcement purposes.").

In reply, Blackburn cites the Public Record Act (PRA), chapter 42.56 RCW, which mandates the full disclosure of public records except for limited exemptions provided by the Act. Cantu v. Yakima Sch. Dist. No. 7, 23 Wn. App. 2d 57, 78, 514 P.3d 661 (2022) (citing Wash. Pub. Emps. Ass'n v. Wash. State Ctr. for Childhood Deafness & Hr'g Loss, 194 Wn.2d 484, 491, 450 P.3d 601 (2019)). The Act explicitly exempts from public inspection and copying "[c]redit card numbers, debit card numbers, electronic check numbers, card expiration dates, or bank or other financial information as defined in RCW 9.35.005 including social security numbers, except when disclosure is expressly required by or governed by other law." RCW 42.56.230(5). RCW 9.35.005 defines "[f]inancial information" as "information identifiable to the individual that concerns the amount and conditions of an individual's assets, liabilities, or credit," including account numbers and balances, "[t]ransactional information concerning an account," and "other information held for the purpose of account access or transaction initiation." RCW 9.35.005(1)(a)-(c). The PRA's broad exemption of credit or debit card numbers and other financial information supports that Washington citizens reasonably expect and should expect that law enforcement would not be able to obtain records associated with the last four digits of their bank cards without a warrant.[19] See Hinton, 179 Wn.2d at 868; Miles, 160 Wn.2d at 244.

---

[19] "Although Article I, Section 7 provides broader privacy protection than the Fourth Amendment, the blanket of protection covers only those privacy interests citizens have come to [reasonably] expect and should expect." State v. Harlow, 85 Wn. App. 557, 564, 933 P.2d 1076 (1997) (citing State v. Goucher, 124 Wn.2d 778, 782, 881 P.2d 210 (1994)).

We hold that the last four digits of a bank card is a Washington citizen's "private affair" falling within the scope of article I, section 7 protections. Our analysis, under the second part of the inquiry, must then turn to whether law enforcement acted with the authority of law when it obtained the last four digits of Blackburn's bank card and his associated purchase history at Lovers.

"Warrantless searches are per se unreasonable under article I, section 7 unless they qualify as specific exceptions to the warrant requirement." State v. White, 141 Wn. App. 128, 135, 168 P.3d 459 (2007) (citing State v. Ross, 141 Wn.2d 304, 312, 4 P.3d 130 (2000)). Here, law enforcement did not obtain a warrant authorizing or limiting its inquiry to confirmation of whether Blackburn or the "8923" bank card digits were associated with the Lovers purchase, but conducted an open-ended, warrantless investigation at the Lovers store of the purchase information for specific items linked to specific accounts, thus disturbing the private affairs of the purchaser. The State bears the heavy burden to show that its examination of Blackburn's bank card information falls within one of the jealously guarded and narrow exceptions to the warrant requirement. See State v. Garvin, 166 Wn.2d 242, 250, 207 P.3d 1266 (2009); State v. Villela, 194 Wn.2d 451, 456, 450 P.3d 170 (2019). The State makes no such attempt. The State conceded at oral argument that nothing prevented it from getting a warrant. Wash. Ct. of Appeals oral arg., supra, at 12 min., 25 sec. through 12 min., 31 sec. "'[W]here the police have ample opportunity to obtain a warrant, we do not look kindly on their failure to do so.'" State v. Ferrier, 136 Wn.2d 103, 115, 960 P.2d 927 (1998) (internal quotation marks omitted) (quoting State v. Leach, 113 Wn.2d 735, 744, 782 P.2d 1035 (1989)); see White, 141 Wn. App. at 135 (stating that warrant exceptions "'provide for those

cases where the societal costs of obtaining a warrant … outweigh the reasons for prior recourse to a neutral magistrate'") (internal quotation marks omitted) (quoting State v. Duncan, 146 Wn.2d 166, 171, 43 P.3d 513 (2002)). During oral argument, when asked if the State was taking the position that it was acceptable for law enforcement to walk into Lovers and obtain without a warrant the last four digits of bank cards and purchasing data for everyone who bought a dildo over the weekend, the State responded, "Yes."[20] Wash. Ct. of Appeals oral arg., supra, at 09 min., 05 sec. through 10 min., 20 sec. We decline to condone such blatant disregard of Washington citizens' basic privacy concerns.

The Kent Police Department, without a warrant, requested purchasing history between specific dates in August 2021 of the blue Lovers dress identified by C.B. After a matching receipt was located that listed a vibrator and a piece of lingerie in addition to two dresses, the investigating detective requested payment information and obtained the last four digits of the bank card that made the purchase. See exs. 17, 18. This information allowed the Kent Police Department to connect the purchased Lovers items to Blackburn. The State does not argue that any warrant exception applied and instead maintains that the last four digits of a person's bank card do not constitute a private

---

[20] After oral argument, the State submitted a statement of additional authorities to clarify that it was not arguing that law enforcement can go to a store and randomly obtain "the last four digits of credit cards" and instead raised a new argument that law enforcement does not need a warrant to disturb a person's private affairs if they individually suspect the person of committing a crime. We do not consider new arguments raised for the first time at or after oral argument. Moreover, for support, the State proffered the Supreme Court's plurality opinion in In re Pers. Restraint of Nichols wherein four justices reasoned a warrantless examination was justified by individualized suspicion in a different context and under different circumstances than the instant case. 171 Wn.2d 370, 376-79, 256 P.3d 1131 (2011) (lead opinion reasoning that individualized suspicion justified police officers' warrantless examination of motel registry shortly after being informed of possible drug-selling activity in motel room); id. at 379 (Madsen, C.J., concurring in result only).

affair under article I, section 7. We disagree and conclude that Blackburn's private affairs were disturbed without the authority of law, constituting an error of constitutional dimension under RAP 2.5(a)(3). See Miles, 160 Wn.2d at 244.

*(ii) Manifest Error*

The second part of the test under RAP 2.5(a)(3) requires Blackburn to show the error is manifest, defined as "a showing of actual prejudice." Kalebaugh, 183 Wn.2d at 584 (internal quotation marks omitted). Actual prejudice requires the challenging party to make a plausible showing that the claimed error had practical and identifiable consequences in the context of the trial. Id.; State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). In the context of an unpreserved suppression claim, an appellant "must show the trial court likely would have granted the motion if made." McFarland, 127 Wn.2d at 334. We must determine "whether the error is so obvious on the record that the error warrants appellate review." O'Hara, 167 Wn.2d at 99-100.

Here, the record before the trial court established that law enforcement obtained the last four digits of Blackburn's bank card and its related Lovers purchases in violation of article I, section 7. Therefore, we conclude that the trial court's error in admitting into evidence the last four digits of Blackburn's bank card in connection with the Lovers purchase is obvious on this record and constituted manifest error under RAP 2.5(a)(3).[21]

---

[21] Blackburn agreed at oral argument that if this court determines the trial court committed an error of manifest constitutional error in its admission of the last four digits of Blackburn's bank card, we need not address his alternative ineffective assistance claim (IAC) for defense counsel's asserted failure to raise an article I, section 7 challenge to the trial court's admission of the partial bank card number. Wash. Ct. of Appeals oral arg., supra, at 1 min., 29 sec. through 2 min., 3 sec. Accordingly, we do not reach the IAC issue raised in Blackburn's opening brief.

*B. Harmless Error*

Even where a manifest error of constitutional magnitude exists under RAP 2.5(a)(3), the rule "does not help a defendant when the asserted constitutional error is harmless beyond a reasonable doubt." Scott, 110 Wn.2d at 687. Under the constitutional harmless error analysis, we presume that constitutional errors are prejudicial. State v. Irby, 170 Wn.2d 874, 885-86, 246 P.3d 796 (2011). The State has the burden of showing that the constitutional error was harmless. State v. Easter, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996). "We find a constitutional error harmless only if convinced beyond a reasonable doubt any reasonable jury would reach the same result absent the error and where the untainted evidence is so overwhelming it necessarily leads to a finding of guilt." Id. (internal citation omitted). If the State cannot prove that the constitutional error was harmless, the remedy is reversal and remand for a new trial. State v. Fuller, 169 Wn. App. 797, 813, 282 P.3d 126 (2012) (citing Easter, 130 Wn.2d at 242).

Blackburn asserts that the last four digits of the bank card used to pay for the August 12, 2021, Lovers purchase was a key piece of evidence for the prosecution because "[n]othing in the actual sales receipt from Lovers established Blackburn was the purchaser." Blackburn claims that it was only the last four digits of the bank card paired with the tax payment information extracted from his cell phone[22] that indicated he made the Lovers purchase. This evidence, Blackburn argues, bolstered C.B.'s

---

[22] See ex. 37.

testimony in a trial that hinged on the jury's weighing of the victim's credibility as the sole eyewitness to the charged offenses.

However, the record shows that even without the last four digits of the bank card unlawfully obtained from Lovers, C.B.'s testimony was corroborated to support a factfinder's reasonable inference beyond a reasonable doubt that it was Blackburn who provided the Lovers items the night of August 13, 2021, at the Westin Hotel.

It was undisputed at trial that Blackburn made a reservation at the Westin Hotel for August 13, 2021, and that Blackburn checked in at the hotel while C.B. waited in the vehicle before they went to "Daniel's" for dinner. During her testimony, C.B. also identified Blackburn in a previously admitted video that showed him checking in at the Westin Hotel on August 13. See ex. 25.

C.B. described how, after she and Blackburn went to dinner, Blackburn took her back to the hotel where there was only one bed. When they arrived at the room, C.B. testified that Blackburn emptied a Lovers bag containing sex toys, lubricant, and lingerie that included a blue fishnet dress and a black fishnet dress. C.B. testified that Blackburn asked her "to put on one of the dresses," had vaginal intercourse with her, asked her to change into the other dress, and then had anal intercourse with her. C.B. testified that Blackburn brought the dresses to the hotel, and that she assumed that he purchased the dresses from Lovers because of the bag they were in.

C.B.'s testimony regarding the Lovers items was corroborated by investigating detective Galetti. Based on C.B.'s description of the blue dress from the Lovers bag that Blackburn brought to the Westin, Galetti found a photo of the blue dress online that C.B. confirmed matched the dress she wore. Galetti testified that she went to a Lovers store

in Kent on December 6, 2021, and provided the image of the blue dress to the store manager who located it and showed it to Galetti. Based on a store receipt admitted at trial, see exhibit 17, Galetti confirmed that a blue dress that fit C.B.'s description was purchased the day before Blackburn checked in at the Westin Hotel. The jury heard testimony about how the August 12, 2021 receipt listed another outfit, which the store manager was also able to locate in stock. Galetti took photos of the two outfits that matched those purchased on August 12, 2021, and her photo of the matching blue dress was admitted at trial.[23] The jury also heard testimony that the August 12 receipt confirmed items purchased at Lovers were similar to what C.B. described.

In addition to the above, which did not rely on Blackburn's testimony regarding the Lovers purchase, Blackburn testified that he purchased the items listed on the August 12 Lovers receipt. Though Blackburn provided his own explanation for why he bought the items and why he reserved a room at the Westin Hotel, he nonetheless admitted that he made the Lovers purchase the day prior to his videotaped check-in at the hotel.

Blackburn argues that this court should not consider Blackburn's admission to the Lovers purchase as it may have been compelled and thus tainted by the erroneous admission of the last four digits of his bank card.[24] Blackburn relies on State v. Spotted Elk, wherein this court held that the trial court erred when it did not suppress the defendant's statement to the arresting officer that she had heroin on her person and her

---

[23] C.B. testified the blue dress in the photo matched the one she wore during the incident at the Westin Hotel on August 13.

[24] In support of this argument, Blackburn also cites State v. Lewis, 130 Wn.2d 700, 705-06 & n.2, 927 P.2d 235 (1996). Because Lewis concerns the prohibition on commenting on a defendant's silence at trial, it is inapposite and we need not address it further.

testimonial act of retrieving the heroin and handing it to the officer. 109 Wn. App. 253, 256, 260-61, 34 P.3d 906 (2001). The court concluded that Spotted Elk's admissions were not preceded by a Miranda[25] warning in violation of her constitutional right to self-incrimination. Id. Concluding that Spotted Elk's testimony at trial was not sufficiently attenuated from the Miranda violations to be untainted, the court concluded that the improperly admitted evidence "likely triggered" Spotted Elk to testify and explain why she had the heroin. Id. at 262.

The Spotted Elk court observed that the untainted evidence left "an exceedingly slim circumstantial thread" to connect the heroin to the defendant to potentially compel her to testify. Id. "This [untainted] evidence showed (1) [arresting] Officer Linn met Ms. Spotted Elk, (2) arrested her on an unrelated warrant, (3) deposited heroin into an evidence bag after arresting Ms. Spotted Elk, and (4) left the heroin at the property room after escorting Ms. Spotted Elk to the jail." Id. Therefore, the untainted evidence was not so "overwhelming as to necessarily result in a guilty verdict." Id.

In the instant case, unlike the dearth of untainted evidence in Spotted Elk, the record supports that it was not merely the partial bank card number that indicated Blackburn had purchased the Lovers items involved in the Westin Hotel incident. Without Blackburn's testimony to offer a different explanation, the jury would still be left with C.B.'s detailed testimony about how Blackburn brought items in a Lovers bag that included a blue dress he made her wear before having sex with her at the Westin Hotel on August 13. The jury further saw the security video, exhibit 25, that corroborated Blackburn's presence at the Westin Hotel on August 13 and testimony from

---

[25] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

investigating detective Galetti and C.B. that supported that the blue dress sold by Lovers the day prior to Blackburn's check-in at the hotel matched the dress that C.B. said her father asked her to wear the night of the incident.

C.B.'s testimony placed Blackburn in a position of having to explain why and how he would have brought the Lovers items with him to the hotel room he shared with C.B. Unlike the improperly admitted evidence in Spotted Elk that likely triggered the defendant's testimony, it is C.B.'s untainted testimony that likely triggered Blackburn's trial testimony. Otherwise, C.B.'s version of events would have been the only version the jury heard. Based on this record, we conclude that Blackburn's testimony at trial was sufficiently attenuated from the admission of the four digits of the bank card used for the Lovers purchase.

Blackburn argues that because his trial turned on a she-said-he-said contest, the State's bolstering of C.B.'s credibility with the improperly admitted bank card digits cannot be harmless. But the State did not solely rely on C.B.'s testimony to challenge Blackburn's credibility. Other evidence included sexually explicit Facebook messages between Blackburn and C.B., the video Blackburn took of him having sex with C.B., and Blackburn's statement made in the jail phone call to his mother that "it wasn't just me. It was – it takes two." Moreover, Blackburn's version of events raised more questions than answers. He testified that he purchased the items from Lovers for a barista and Vanessa, an escort, but offered no explanation as to how it came to be that C.B. would have known what those items were.

We are convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the constitutional error, and that the untainted evidence

overwhelmingly supports the convictions, with the exception of Count 8 as discussed below.

## Sufficiency of the Evidence

Blackburn argues that the State presented insufficient evidence to support three of his convictions. We disagree as to Blackburn's challenges to his conviction for rape of a child in the third degree (Count 2) and one of his convictions for incest in the first degree (Count 5) but agree that the record is insufficient to support his conviction for incest in the first degree under Count 8.

We review sufficiency of the evidence presented during a trial de novo. State v. Berg, 181 Wn.2d 857, 867, 337 P.3d 310 (2014). Our review is still "'highly deferential to the jury's decision.'" In re Pers. Restraint of Arntsen, 2 Wn.3d 716, 724, 543 P.3d 821 (2024) (quoting State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014) (plurality opinion)). Due process requires the State to prove every element of the crimes charged beyond a reasonable doubt. State v. Smith, 155 Wn.2d 496, 502, 120 P.3d 559 (2005). The test requires an appellate court to determine "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found [the defendant] guilt[y] beyond a reasonable doubt." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Thus, "[a] sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from it." State v. O'Neal, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). Circumstantial evidence is considered as reliable as direct evidence. State v. Cardenas-Flores, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). We draw all reasonable inferences from the evidence in favor of the prosecution

and defer to the jury on questions of witness credibility, persuasiveness of the evidence, and conflicting testimony. Arnsten, 2 Wn.3d at 724.

Under the law of the case doctrine, "'the State assumes the burden of proving otherwise unnecessary elements of the offense when such added elements are included without objection in the "to convict" [jury] instruction.'" State v. Johnson, 188 Wn.2d 742, 756, 399 P.3d 507 (2017) (quoting State v. Hickman, 135 Wn.2d 97, 102, 954 P.2d 900 (1998)). "The to-convict instruction defines the essential elements of a crime." Id. at 760. A defendant may assign error to elements added under the law of the case doctrine on appeal. Hickman, 135 Wn.2d at 102. "When determining whether there is sufficient evidence to prove the added element, the reviewing court inquires 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. at 103 (internal quotation marks omitted) (quoting State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)). We read the jury instructions in the context of the instructions as a whole. State v. France, 180 Wn.2d 809, 816, 329 P.3d 864 (2014).

In Washington, conviction of a criminal defendant requires a unanimous jury to conclude that the defendant committed the criminal act as charged. State v. Stephens, 93 Wn.2d 186, 190, 607 P.2d 304 (1980). "In cases where several acts are alleged, any one of which could constitute the crime charged, the jury must unanimously agree on the act or incident that constitutes the crime." State v. Hayes, 81 Wn. App. 425, 430, 914 P.2d 788 (1996) (citing State v. Petrich, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), overruled on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988)). In such cases, the trial court must instruct the jury, through a Petrich unanimity

32

instruction,[26] that they must unanimously agree that "the same underlying criminal act" has been proven beyond a reasonable doubt for each count or the State must elect one alleged incident to rely on for conviction on each count. State v. Beasley, 126 Wn. App. 670, 682, 109 P.3d 849 (2005).

"In sexual abuse cases where multiple counts are alleged to have occurred within the same charging period, the State need not elect particular acts associated with each count so long as the evidence 'clearly delineate[s] specific and distinct incidents of sexual abuse' during the charging periods." Hayes, 81 Wn. App. at 431 (alteration in original). The trial court must also instruct the jury that they must be unanimous as to which act constitutes each count charged and that they must find "'separate and distinct acts'" for each count when counts are identically charged. Id. (quoting State v. Noltie, 116 Wn.2d 831, 842-43, 809 P.2d 190 (1991)).

Blackburn argues the State failed to present evidence to support all the elements as to counts 2, 5, and 8. It is undisputed that the trial court provided a proper unanimity instruction to the jury on each of the counts that Blackburn challenges. Our inquiry thus focuses on the question of whether the evidence was sufficient to sustain Blackburn's convictions in these counts. The record shows sufficient evidence for specific and distinct acts of sexual assault for all charged crimes except Count 8, for which we hold evidence was insufficient to support a reasonable inference that Blackburn had sexual intercourse with C.B. within the specified time frame.

---

[26] State v. Carson, 184 Wn.2d 207, 216-17, 357 P.3d 1064 (2015) (citing Petrich, 101 Wn.2d at 568, 572).

*A. Count 2*

Blackburn argues that his charge for child rape in the third degree lacked sufficient evidence because the State presented no evidence that C.B. was at least 14 years old and younger than 16 years old at the time of the offense.

RCW 9A.44.079 provides that "[a] person is guilty of rape of a child in the third degree when the person has sexual intercourse with another who is at least fourteen years old but less than sixteen years old and the perpetrator is at least forty-eight months older than the victim." The Supreme Court has approved of this court's prior holding that the lower age limit is not an element of the offense of child rape in the third degree. State v. Goss, 186 Wn.2d 372, 381, 378 P.3d 154 (2016) (citing State v. Smith, 122 Wn. App. 294, 296, 93 P.3d 206 (2004)). In concluding that the lower age limit in the child molestation in the second degree statute does not create an essential element of the crime, the court in Goss stated:

> The lower age limit (unlike the highest) is not a fact "whose specification is necessary to establish the very illegality of the behavior charged." [State v. Zillyette, 178 Wn.2d 153, 158, 307 P.3d 712 (2013) (internal quotation marks omitted).]

> Our conclusion is bolstered by the fact that our Court of Appeals has repeatedly held that the lower age limit is not an element of analogous crimes without any corrective legislative response. See, e.g., [Smith, 122 Wn. App. at 296]; State v. Dodd, 53 Wn. App. 178, 180-81, 765 P.2d 1337 (1989). The legislature's failure to respond suggests it does not think the lower age threshold in statutes involving sexual contact with children functions as an element.

Id. (footnote omitted); see also Smith, 122 Wn. App. at 298 & n.1 (discussing Dodd).

However, the trial court in the instant case instructed the jury that to convict Blackburn of the crime of rape of a child in the third degree, they had to find beyond a reasonable doubt:[27]

> (1) That on or about the period <u>between August 10, 2015 and August 9, 2017</u>, on an occasion separate and distinct from other counts, the defendant had sexual intercourse with C.B.;
> (2) That C.B. was <u>at least fourteen years old but was less than sixteen years old</u> at the time of the sexual intercourse and was not married to the defendant and was not in a state registered domestic partnership with the defendant;
> (3) That C.B. was at least forty-eight months younger than the defendant; and
> (4) That this act occurred in the State of Washington.

(Emphasis added.) The instruction's requirement that C.B. be at least fourteen years old thus became the law of the case.

Blackburn claims that C.B.'s testimony was too generic to support the reasonable inference that Blackburn raped her in the specified time frame.

To determine whether a victim's purportedly generic testimony about repeated sexual abuse is sufficient to sustain a specific conviction, we apply the three-part <u>Hayes</u> test:

> First, the alleged victim must describe the kind of act or acts with sufficient specificity to allow the trier of fact to determine what offense, if any, has been committed. Second, the alleged victim must describe the number of acts committed with sufficient certainty to support each of the counts alleged by the prosecution. Third, the alleged victim must be able to describe the general time period in which the acts occurred.

<u>Hayes</u>, 81 Wn. App. at 438; <u>e.g.</u>, <u>State v. Yallup</u>, 3 Wn. App. 2d 546, 554, 416 P.3d 1250 (2018) (applying <u>Hayes</u> factors). This test seeks to balance the defendant's due

---

[27] It appears both parties offered a to-convict instruction for rape of a child in the third degree based on Washington pattern jury instruction 44.15 that included the date and age range elements. <u>See</u> 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 44.15 (5th ed.) (WPIC).

process rights with the inability of the young victim to give extensive details about regular and frequent abuses, including the specific timing of each assault. Hayes, 81 Wn. App. at 438; Yallup, 3 Wn. App. 2d at 554. "The trier of fact must determine whether the testimony of the alleged victim is credible on these basic points." Hayes, 81 Wn. App. at 438.

Here, C.B.'s testimony provides sufficient evidence to support that Blackburn first anally raped C.B. when she was 14 or 15 years old to support his conviction for rape of a child in the third degree under Count 2.[28] C.B. testified that Blackburn put his penis into her anus while they lived at both the Petrovitsky house and the Kent house and that the first time he did it was in 2016 when she was 15 or 16 years old. C.B. recalled that this particular time Nitz was at work and her grandma was at the doctor. Blackburn told C.B. that he wanted to try anal intercourse. C.B. told him no. Blackburn then pushed her on the bed, pulled her pants down, spit on his hand, rubbed his hand on her anus, held her down, and penetrated her anus with his penis until he ejaculated. Based on C.B.'s birthdate, which both C.B. and Blackburn testified was August 10, 2001, C.B. would have been 14 or 15 years old in 2016. Therefore, viewing this testimony in a light most favorable to the State, any rational factfinder could have found that the prosecution

---

[28] The State's response was confusing when asked to clarify at oral argument which incident it relies on in the record to support Blackburn's conviction under Count 2. Wash. Ct. of Appeals oral arg., supra, at 16 min., 57 sec. through 20 min., 58 sec. Regardless, Blackburn does not dispute that the jury was provided a unanimity instruction, and it is his burden on appeal to "show that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Allen, 159 Wn.2d 1, 7, 147 P.3d 581 (2006). This court reviews the entire record to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. State v. Gatlin, 158 Wn. App. 126, 131, 241 P.3d 443 (2010) (citing Salinas, 119 Wn.2d at 201).

proved that Blackburn raped C.B. in the time frame specified in the to-convict instruction beyond a reasonable doubt.[29] Hickman, 135 Wn.2d at 103.

Lastly, we reject Blackburn's argument that irrespective of evidence that Blackburn anally raped C.B. within the time frame specified for Count 2, the State should be held to its ostensible election in closing argument to prove that he vaginally raped C.B. to sustain the conviction.[30] Blackburn asserts that the prosecution "made the … election in closing" when the prosecutor stated to the jury: "You pick any vaginal rape after [Nitz] moved in for Count [2], age 14 or 15. So any that occurred between August 10, 2015, and August 9, 2017." Blackburn, however, does not dispute that the jury was provided with a unanimity instruction to agree on the incident of sexual intercourse that supported his conviction under Count 2. The trial court also instructed the jury that lawyers' statements are not evidence and to disregard any statement not supported by the evidence or the law in the court's instructions. It is well established that jurors are presumed to follow the court's instructions. State v. Gallaher, 24 Wn. App. 819, 822, 604 P.2d 185 (1979). Blackburn concedes that no controlling authority supports his proposition that a prosecutor's statements in closing about what incidents the jury may consider regarding a specific count in a multiple acts case effectively limits what evidence the jury can consider where a unanimity instruction has been provided. Wash. Ct. of Appeals oral arg., supra, at 23 min., 54 sec. through 25 min., 52 sec. Blackburn

---

[29] Blackburn argues that because C.B. testified that this incident occurred in 2016 and also at the Kent house, which the family did not move into until 2018, there is insufficient testimony to establish that C.B. was at least 14 years old and less than 16 years old at the time of the offense. Because this court defers to the jury on conflicting testimony, this argument is unpersuasive. State v. Raleigh, 157 Wn. App. 728, 736-37, 238 P.3d 1211 (2010).

[30] Blackburn clarified this election claim at oral argument. Wash. Ct. of Appeals oral arg., supra, at 22 min., 13 sec. through 22 min., 45 sec., 23 min., 28 sec. through 25 min., 37 sec.

instead suggested at oral argument that it is "good policy" for this court to hold the State to its purported election in closing,[31] which he did not provide substantive argument for in his briefing and for which we will not create argument on his behalf. See Collins v. Clark County Fire Dist. No. 5, 155 Wn. App. 48, 95-96, 231 P.3d 1211 (2010); Swank v. Valley Christian Sch., 188 Wn.2d 663, 675 n.6, 398 P.3d 1108 (2017).

We hold that the evidence is sufficient to sustain Blackburn's conviction for child rape in the third degree on Count 2.

B.  Count 5

Blackburn argues that C.B.'s testimony was too generic and speculative to establish that Blackburn committed incest in the first degree within the required time period of January 1, 2018, to January 1, 2019, in Count 5.

Under RCW 9A.64.020(1)(a), "[a] person is guilty of incest in the first degree if he or she engages in sexual intercourse with a person whom he or she knows to be related to him or her, either legitimately or illegitimately, as an ancestor, descendant, brother, or sister of either the whole or the half blood."

Here, the to-convict instruction for Count 5 required the jury to find beyond a reasonable doubt:

> (1) That between January 1, 2018 and January 1, 2019, on an occasion separate and distinct from other counts, the defendant engaged in sexual intercourse with C.B.;
> (2) That C.B. was related to the defendant as a descendant;
> (3) That at the time the defendant knew the person with whom he was having sexual intercourse was so related to him; and
> (4) That any of these acts occurred in the State of Washington.

---

[31] Wash. Ct. of Appeals oral arg., supra, at 26 min., 4 sec. through 26 min., 11 sec.

(Emphasis added.) Though time is not an element under RCW 9A.64.020(1)(a), both the State and defense proposed the to-convict instruction with the same time frame, which the court adopted. The State does not dispute that the time period became an element of the offense. Specifically, the State was required to prove that Blackburn committed a separate and distinct act of incestuous sexual intercourse between January 1, 2018 and January 1, 2019.

Here, there is sufficient evidence to support that Blackburn had sexual intercourse between the required time period. C.B. testified that Blackburn put his penis into C.B.'s vagina multiple times when they lived at the Kent house and that it usually happened in his bedroom. Specifically, C.B. testified that the first time Blackburn penetrated her vagina with his penis in the Kent house was soon after they moved to the house in 2018 when she was around 16 or 17 years old.

C.B. described how Blackburn came into her room and laid down on the bed with her. C.B. said that when Blackburn started cuddling her, she "already knew what that was insinuating." C.B. told Blackburn that "this wasn't something that I wanted to do" and Blackburn in response made her feel guilty by telling her that he works all day while she stays at home and that he has taken care of her since she was little. Blackburn then took C.B.'s pants off, started touching her on her vagina with his fingers, took his pants down, and penetrated C.B.'s vagina with his penis. C.B. confirmed that, like a different time that Blackburn penetrated her vagina with his penis when she was in the eighth grade after she asked to go to the Puyallup Fair, this time started with Blackburn coming into the room and touching C.B. and then progressed to Blackburn putting his penis into her vagina. C.B. testified this was usually how Blackburn's sexual assaults progressed.

Blackburn presents a false dichotomy in his assertion that the prosecutor clarified with C.B. that this so-called "guilt trip" incident was a "different time" than the first time that Blackburn had sexual intercourse with C.B. at the Kent house, thus leaving C.B.'s testimony too sparse to place a distinct act of sexual intercourse between January 1, 2018 and January 1, 2019. Viewed in a light most favorable to the State, the prosecutor's questioning can be reasonably interpreted as differentiating this "guilt trip instance" from the Puyallup Fair incident when C.B. was in eighth grade. See O'Neal, 159 Wn.2d at 505. Regardless, C.B. testified that Blackburn first put his penis inside her vagina in the Kent house "soon after" they moved in 2018, when she was 16 or 17 years old. This is sufficient to place one of Blackburn's incestuous sexual assaults against C.B. within the time frame required by the to-convict instruction for Count 5. Cf. State v. Jensen, 125 Wn. App. 319, 323, 328, 104 P.3d 717 (2005) (finding insufficient evidence for one of three molestation convictions where victim did not testify that sexual contact occurred during two additional times that defendant entered her room at night); State v. Edwards, 171 Wn. App. 379, 402-03, 294 P.3d 708 (2012) (finding insufficient evidence where there was no evidence defining the time period during which the alleged molestation occurred).

C. Count 8

Like the above-discussed counts, the to-convict instruction for Count 8 the State added a time-frame element that became the law of the case. The instruction stated that to convict Blackburn of incest in the first degree on Count 8, the jury had to find beyond a reasonable doubt:

(1) That between October 1, 2021 and October 13, 2021, on an occasion separate and distinct from other counts, the defendant engaged in sexual intercourse with C.B.;
(2) That C.B. was related to the defendant as a descendant;
(3) That at the time the defendant knew the person with whom he was having sexual intercourse with was so related to him; and
(4) That any of these acts occurred in the State of Washington.

(Emphasis added.) Blackburn argues that the State failed to present sufficient evidence to prove beyond a reasonable doubt that he had sexual intercourse with C.B. within the specified time period of October 1, 2021 to October 13, 2021. Because the jury would have to speculate to infer from the evidence that Blackburn had sexual intercourse with C.B. between the dates set forth in the to-convict instruction, we agree.

C.B. testified to an incident that occurred in fall 2021 when she was 20 years old and still living at the Kent house in which Blackburn came home frustrated and demanded that they have sex. Blackburn told C.B. she was "useless" and that having sex with him was the least she could do because all she does "is watch TV and smoke weed all day." Blackburn then penetrated C.B.'s vagina with his penis while C.B. was on her knees on Blackburn's bed. The incident occurred with Blackburn's bedroom door closed and C.B. recalled, "My grandmother was in her bedroom, and my grandfather was in his office."

Our Supreme Court has held that "[t]he 'to convict' instruction carries with it a special weight because the jury treats the instruction as a 'yardstick' by which to measure a defendant's guilt or innocence." State v. Mills, 154 Wn.2d 1, 6, 109 P.3d 415 (2005). Further, the law of the case doctrine's requirement that the State prove every element in a jury instruction to which it does not voice opposition "benefits the system by encouraging trial counsel to review all jury instructions to ensure their propriety

before the instructions are given to the jury." Hickman, 135 Wn.2d at 105; see CrR 6.15(c). The State does not carry its burden to prove every element by a reasonable doubt by relying on evidence that requires the jury to draw inferences based on speculation. State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013). A "'modicum'" of evidence is not sufficient. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016) (internal quotation marks omitted) (quoting Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

Here, the law of the case doctrine required the State to prove beyond a reasonable doubt that Blackburn had sexual intercourse with C.B. sometime "between October 1, 2021 and October 13, 2021."[32] (Emphasis added.) C.B.'s testimony, without more, required the jury to hypothesize that the incident she described in fall 2021 occurred between the October dates required by the to-convict instruction. The existence of a necessary fact of an offense cannot be based on such a guess or conjecture. State v. Colquitt, 133 Wn. App. 789, 796, 137 P.3d 892 (2006).

The State relies on Blackburn's testimony that he last "shared a bed" with C.B. a few days before she moved out of the Kent house on October 6, 2021. The State argues that if viewed in combination with C.B.'s testimony that Blackburn had sexual

---

[32] The instant case is different from sexual assault cases where courts have followed the rule that "where time is not a material element of the charged crime, the language 'on or about' is sufficient to admit proof of the act at any time within the statute of limitations, so long as there is no defense of alibi." Hayes, 81 Wn. App. at 432 (emphasis added); see Yallup, 3 Wn. App. 2d at 550, 553-54 & nn.2-3 (upholding verdict from bench trial where charging language used "on or between" language and the victim's testimony placed incidents in period that was eight months after the charging period but within statute of limitations period); see also Yallup, 3 Wn. App. 2d at 553 ("When charging using 'on or about' or similar language, the proof is not limited to the delineated time period.") (citing Hayes, 81 Wn. App. at 432 n.12 (collecting cases)); Jensen, 125 Wn. App. at 326-27 (upholding jury verdict based on victim testimony where to-convict instruction required proof of offenses "on or about August 1, 2001 through February 19, 2002") (emphasis added).

intercourse with her sometime in fall 2021, Blackburn's testimony that he "shared a bed" with C.B. could be reasonably inferred to mean that Blackburn had sex with C.B. a few days before October 6. The State posits that this evidence taken together is sufficient to prove that the fall 2021 incident occurred within the date range specified by the to-convict instruction to support Blackburn's conviction on Count 8.

The State's theory disregards, however, Blackburn's testimony in which he clarifies what he meant by "shared a bed." On redirect defense asked Blackburn:

> Q. … Mr. Blackburn, you said that you shared your bed with [C.B.]. Can you elaborate on that?
> A. "Shared" it as she would come in and hang out and spend time watching TV or conversating. The furniture in the bedroom is a bed.
> …
> Q. Okay. And so it was to watch TV. And was there any other reason that she would come in?
> A. Just – just to hang out.
> Q. Okay. Do you know if she watched TV in your bedroom when you weren't there?
> A. Yes. Yes, she did.
> Q. How do you know that?
> A. She would FaceTime me. She would be in my room. It didn't matter whether I was there or wasn't there. That was – that was where she hung out and watched TV.

Blackburn otherwise denied any sexual allegations.

The State also disregards C.B.'s testimony that she slept in Blackburn's bed at the Kent house "the majority of the time." C.B. testified that she and Blackburn shared his bedroom, and that she would sleep on top of the covers while Blackburn slept under the covers to make an extra layer between them. The record does not support that Blackburn had sexual intercourse with C.B. whenever they shared or slept in the same bed. See Jensen, 125 Wn. App. at 327-28. Thus, even viewing the testimony in a light most favorable to the prosecution, the evidence does not support a reasonable

inference that Blackburn had sexual intercourse with C.B. between October 1, 2021 and October 13, 2021. To find Blackburn guilty of Count 8 would have to be based on speculation, not evidence. This is insufficient.

The proper remedy where the State does not present sufficient evidence of all the elements of the crime, including added elements, is to reverse the conviction and dismiss with prejudice. Hickman, 135 Wn.2d at 103. Because the evidence is insufficient, we reverse Blackburn's conviction on Count 8 and remand with instructions for the trial court to dismiss the charge with prejudice.

The State asserts that the reversal of the conviction does not necessitate resentencing because Blackburn's offender score will remain above 9[33] and he was sentenced to the low end of the standard range on all counts.

If the trial court imposed a low-end sentence and a reduction of the offender score could not result in a lower sentence within the standard range, then resentencing is not necessary. See State v. Johnson, 61 Wn. App. 539, 552, 811 P.2d 687 (1991). This situation does not apply in the instant case. As stated above, the trial court sentenced Blackburn to an indeterminate sentence of 210 months to life on his most serious convictions for child rape in the second degree under RCW 9A.44.076. See RCW 9.94A.507(1)(a)(i), (3)(b), (5); RCW 9A.44.076(2); RCW 9A.20.021(1)(a). For his concurrent sentences on the four remaining counts of incest in the first degree—counts 3, 5, 6, and 7—the trial court sentenced Blackburn to 102 months of imprisonment, which is the high end of the sentencing range provided by the sentencing grid under

---

[33] Blackburn does not dispute the State's assertion that his offender score will remain above 9 "without any or all three [challenged] counts [of 2, 5, and 8]."

RCW 9.94A.510[34] and lower than the maximum term of confinement for the offense under RCW 9A.20.021(1)(b). See RCW 9A.64.020(1)(b) (class B felony); State v. Toney, 149 Wn. App. 787, 795-96, 205 P.3d 944 (2009). Because the trial court has the discretion to impose a lower sentence of confinement on Blackburn's concurrent counts of 3, 5, 6, and 7 based on a reduced offender score,[35] and those sentences could become relevant if Blackburn's convictions under RCW 9A.44.076 were successfully challenged on collateral review, we remand for resentencing.

<u>Sentence Exceeding Statutory Maximum</u>

Blackburn contends that his combined sentence of confinement and community custody exceeds the statutory maximum allowable for his convictions under counts 2, 3, 5, 6, and 7. We accept the State's concession that the trial court erred in imposing aggregate confinement and community custody terms above the statutory maximum for the challenged counts.[36]

A court may not impose a sentence providing for a term of total confinement or community custody that exceeds the statutory maximum for the offense. RCW

---

[34] Based on the offense seriousness level of VI and Blackburn's offender score of 9+, the minimum standard sentence for incest in the first degree is 77 months. RCW 9.94A.510, .515; The high end of the range under the grid is 102 months, which is lower than the maximum allowed 120 months for the class B felony offense. RCW 9A.64.020(1)(b); RCW 9A.20.021(1)(b); RCW 9.94A.510, .515.

[35] On Count 2, rape of a child in the third degree, Blackburn was concurrently sentenced to 60 months of confinement under RCW 9A.20.021(1)(c), which is less than the standard range under RCW 9.94A.510 based on the offense seriousness level of VI and his offender score of 9+. RCW 9.94A.515, see RCW 9A.44.079(2) (class C felony); Toney, 149 Wn. App. at 795-96. Because Blackburn's sentence is below the low end of the standard range under RCW 9.94A.510, resentencing on Count 2 is only necessary to the extent it must comply with RCW 9.94A.701(10) as discussed below.

[36] Based on our decision to reverse Blackburn's conviction for incest in the first degree under Count 8, we do not address his sentencing argument regarding that count.

45

9.94A.505(5).[37] The trial court must reduce the community custody term where the offender's standard range term of total confinement combined with the term of community custody exceeds the statutory maximum for the crime. RCW 9.94A.701(10);[38] State v. Gililung, 31 Wn. App. 2d 718, 722, 552 P.3d 813 (2024), review denied, 574 P.3d 573 (2025) (citing State v. Boyd, 174 Wn.2d 470, 473, 275 P.3d 321 (2012)). The remedy on appellate review is to remand to the trial court to either amend the community custody term or to resentence the offender consistent with the statute. Gililung, 31 Wn. App. 2d at 722 (citing Boyd, 174 Wn.2d at 473).

For each of the five challenged counts—2,[39] 3, 5, 6, and 7[40]— the trial court imposed terms of total confinement that, combined with an additional 36 months of community custody, exceeded the statutory maximum for the corresponding offense. Accordingly, we remand the matter for the trial court to either amend the term of community custody or resentence Blackburn on counts 2, 3, 5, 6, and 7 consistent with RCW 9.94A.701(10).

---

[37] A new version of RCW 9.94A.505 became effective since Blackburn's sentencing, as of January 1, 2026, but the relevant language of subsection .505(5) remains the same.

[38] A new version of RCW 9.94A.701 became effective since Blackburn's sentencing, as of January 1, 2026, but the related amendments are not material to this analysis.

[39] Blackburn was convicted of child rape in the third degree in Count 2. A class C felony, the offense has a statutory maximum of 60 months in confinement. RCW 9A.44.079(2); RCW 9A.20.021(1)(c). The trial court sentenced Blackburn to 60 months of confinement and imposed an additional 36 months of community custody.

[40] On counts 3, 5, 6, and 7, Blackburn was convicted of incest in the first degree. A class B felony, the offense has a statutory maximum of 120 months in prison under RCW 9A.20.021(1)(b). RCW 9A.64.020(1)(b). On each count, the trial court sentenced Blackburn to 102 months of confinement and an additional 36 months of community custody.

## Community Custody Conditions

Blackburn in his opening brief challenged the trial court's imposition of two community custody conditions. He acknowledges in his reply brief that recent case law is dispositive on these claims. We agree and conclude that neither challenge has merit.

First, the trial court imposed a standard community custody condition requiring him to "[r]emain within geographic boundaries, as set forth in writing by the Department of Correction Officer or as set forth with SODA [i.e., Stay Out of Drug Areas] order." Blackburn argued in his opening brief that the condition was unconstitutionally vague. We considered the same argument in State v. Lundstrom, concluding that the condition was not unconstitutionally vague. 34 Wn. App. 2d 977, 979-81, 983, 572 P.3d 1243 (2025). For the reasons set forth in Lundstrom, we continue to conclude the geographic boundaries condition is not unconstitutionally vague.

Second, the trial court imposed a special community custody condition requiring Blackburn to "[b]e available for and submit to urinalysis [UA] and/or breathanalysis [BA] upon request of the [Community Corrections Officer] and/or chemical dependency treatment provider." Blackburn argued in his opening brief that because the condition is not related to his offenses, it violates his privacy interests protected by article I, section 7. He recognizes in his reply brief that our state Supreme Court recently addressed this issue in State v. Nelson, 4 Wn.3d 482, 484-85, 501-10, 565 P.3d 906 (2025).

In Nelson, the Supreme Court reiterated its holding in State v. Olsen that BA and UA testing community custody conditions are only supported by the authority of law under article I, section 7 if "they serve 'a compelling interest, achieved through narrowly tailored means.'" Id. at 503 (quoting State v. Olsen, 189 Wn.2d 118, 128, 399 P.3d 1141

(2017)). The court, acknowledging a split amongst the Court of Appeals, responded to Nelson's request to address whether article I, section 7 permits compliance monitoring through BA and UA testing if "there is no evidence drugs or alcohol contributed to the offenses." Id. at 484-85, 498, 501-10 (internal quotation marks omitted). The court rejected the notion that the only compelling interest the State could have to support random BA and UA testing is the prevention of similar crimes. Id. at 505-07. Instead, the State's "[p]rotection of the public is achieved not merely by preventing similar crimes but by ensuring the person on community custody is willing and able to comply with all applicable legal requirements," which the State cannot do without tools to monitor the offender's compliance with valid sentencing conditions. Id. at 506. Thus, the court held, "the State has a compelling interest in monitoring Nelson's compliance with his valid community custody conditions prohibiting drug and alcohol use, regardless of the specific facts of his underlying offenses." Id. at 506-07. Further, where random BA and UA testing is authorized for the limited purpose of assessing a defendant's compliance with a valid prohibition on drug and alcohol use, "such testing 'is a narrowly tailored monitoring tool imposed pursuant to a valid prohibition on drug and alcohol use.'" Id. at 507 (quoting Olsen, 189 Wn.2d at 134); see id. at 503-04 (citing RCW 9.94A.703(2)(c), (3)(e)). Blackburn does not argue that the trial court imposed the random UA and BA testing for a reason other than to monitor his compliance with valid conditions. Following Nelson, we conclude the condition does not violate Blackburn's privacy interests under article I, section 7.

## CONCLUSION

We affirm in part, reverse Blackburn's conviction for incest in the first degree in Count 8, and remand for resentencing on counts 2, 3, 5, 6, and 7 consistent with RCW 9.94A.701(10).

_Coburn, J._

WE CONCUR:

_Birk, J._

_Mann, J._